Fuld, J.
Upon direct appeals from Special Term orders dismissing the complaints of the three appellants, we are called upon to consider the constitutionality of section 4 of the Emergency Housing Kent Control Law as amended in 1962 (§ 4, subd. [a], as amd. by L. 1962, ch. 21, § 4).[1] In essence, and insofar as applicable, it provides that the value of rent-controlled residential property, on which the landlord is entitled to a 6% return, is to be fixed by applying 1954 equalization rates to the current assessed valuation of such property.[2] The challenged provision revokes the 1961 amendment which had employed equalization rates for “ the most recent year ” (L. 1961, ch. 337) and restores the formula which had been in use from 1957 to June 30, 1961 (L. 1957, ch. 755; L. 1959, ch. 695).
Two of the appellants, Bucho and Victory, are landlords, the third, Marjorie Murphy, is a tenant. Each asserts that the change in law adversely affected him—the landlords charging *473 that it deprives them of rent increases to which they would otherwise have been entitled, the tenant complaining that it subjects her to more of a rent increase than she would have otherwise had to pay — and all claim that such change is unconstitutional.
In its complaint, Bucho alleges that in September, 1961 it filed for an increase based on a 6% return; that the property was assessed at $513,500 and that the 1961 equalization rate for apartment houses in Mount Vernon, where its property is located, was 71% ; that, on the basis of equalized assessed value at 1961 rates, it was entitled to an annual increase in rents of $12,023; that the 1954 equalization rate was 95 %; and that, on the basis of such rate, its application for an increase was denied.
Victory’s complaint alleges that its Hempstead (Long Island) property does not yield a 6% return on its assessed value as equalized by the 1961 village rate for apartments. The appellant was in the process of filing its application for an increase when the administrative freeze order of October 31, 1961 was issued. It would have been entitled to an increase in rents under the 1961 statute, but is not so entitled under the 1962 amendment.
The tenant Murphy’s complaint recites that in 1961 her landlord filed for a 6% return on the equalized assessed value; that the assessed value is $347,750; that the 1961 equalization rate for apartment houses in New Rochelle, where the appellant resides, was 103% (treated as 100% under the rent control law); that her landlord was entitled to an annual increase of about $519; that the 1954 equalization rate was 92% and that, on the basis of such rate, the landlord became entitled to an increase of approximately $2,525.
The existence of an emergency justifying continued control of rents in the areas here involved may not, and indeed is not, denied. Accordingly, our inquiry is directed solely to the attack on the constitutionality of the statute insofar as it restores the 1954 equalization rates—instead of continuing the “most recent ” rates — as a factor in computing the 6% return which the landlord is to receive. The appellants, of course, have no constitutional right to a continuation of any particular ‘ ‘ fair return ” formula. (See, e.g., I. L. F. Y. Co. v. Temporary State Housing Rent Comm., 11 N Y 2d 259; I. L. F. Y. Co. v. Temporary State Housing Rent Comm., 10 N Y 2d 263, 270, app. dsmd. 369 *474 U. S. 795; Matter of West, 289 N. Y. 423, 430-431.) However, all three appellants contend that the utilization of equalization rates other than the most recent deprives them of equal protection of the laws (U. S. Const., 14th Arndt.; N. Y. Const., art. I, § 11), while the two appellant landlords claim that it also denies them due process of law (U. S. Const., 14th Arndt.; N. Y. Const, art. I, § 6).
As to the argument on due process grounds, it should first be pointed out that the allegations of the complaints provide no basis for holding that the 1962 legislation effects a confiscatory result. There is no sufficient recital — and of course no showing — that the appellant landlords are limited to an unreasonably low return on their investments. There is certainly no constitutional compulsion that there be a return of 6% even on market value. The 6% rate was undoubtedly thought by the Legislature to be “ fair and equitable ”, but it does not follow that a lesser rate would be deemed confiscatory and, consequently, constitutionally impermissible. (See, e.g., Denver Stock Yard Co. v. United States, 304 U. S. 470, 483; Banton v. Belt Line Ry., 268 U. S. 413, 423.) Indeed, in Teeval Co. v. McGoldrick (304 N. Y. 859), we held that a 4% return on residential property did not offend against constitutional guarantees or requirements. Even if it be assumed that the appellant landlords are precluded from receiving a 6% return on market value by the use of 1954 equalization rates, since there is no suggestion that the return which they are allowed is so low as to be unreasonable, there is neither basis nor jurisdiction for invalidating the statute on that ground.
Nor does the legislation before ns offend due process on the ground that it is an unreasonable exercise of the police power bearing no reasonable relationship to a legitimate legislative purpose. The Legislature found it necessary to provide for residential rent control in order to “ prevent exactions of unjust, unreasonable and oppressive rents ” which would result in “ uncertainty, hardship and dislocation ” (Emergency Housing Rent Control Law, § 1 [L. 1946, ch. 274, § 1, as amd.]). The prevention of these evils is clearly a valid legislative purpose. (See, e.g., Bowles v. Willingham, 321 U. S. 503; Block v. Hirsh, 256 U. S. 135; Teeval Co. v. Stern, 301 N. Y. 346, cert. den. 340 U. S. 876; People ex rel. Durham Realty Corp. v. La Fetra, 230 *475 N. Y. 429, app. dsmd. 257 U. S. 665.) And the legislative history of the statutory provision here challenged amply attests to the reasonableness of its relationship to this legitimate legislative end.
As noted previously, from 1957 to June 30, 1961, 1954 equalization rates were employed in computing the value of a landlord’s property for rent control purposes. In 1961 the Legislature, for the first time in the history of rent control, decided to adopt a forthcoming schedule of equalization rates without first having had an opportunity to study them. Chapter 337 of the Laws of 1961 discontinued the use of the earlier 1954 equalization rates and substituted a requirement that assessed value be adjusted by the ‘1 most recent ’ ’ equalization rate available. The statute was enacted on April 6,1961. The new equalization rates, however, were not announced until June. As Governor Rockefeller later noted—in January, 1962 — the legislative action, necessarily taken without detailed information as to the specific impact of the new equalization rates, was based upon an assumption that the use of current rates would effect fair and equitable results. (See Report of New York State Temporary Commission to Study Rents and Rental Conditions, dated March 28, 1962 [N. Y. Legis. Doc., 1962, No. 15], p. 13.)
The new (1961) rates reflected a sharp drop from those of 1954 and it became obvious, to cull from the 1962 Report of the New York State Temporary Commission to Study Rents and Rental Conditions (N. Y. Legis. Doc., 1962, No. 15, p. 13), that their impact ‘1 would have a drastic or undesirable effect upon the maximum rents of a substantial number of controlled tenants.” [3] In view of this unexpected result, the Governor directed the Rent Administrator to study the impact of the new law and he also announced that no action would be taken on applications for increases based on 1961 equalization rates pending outcome of that study. Subsequently, the Governor recommended the reinstatement of 1954 equalization rates and the Legislature passed the statute now under attack.
In the light of this legislative history, it is apparent that the Legislature was faced, or so it could reasonably have eon- *476 eluded (see, e.g., Wiggins v. Town of Somers, 4 N Y 2d 215, 219; Matter of Stubbe v. Adamson, 220 N. Y. 459, 469), with the immediate danger of “ serions threats to the public health, safety and general welfare ’ ’ which would result from the ‘‘ disruptive practices and abnormal conditions” produced by the mass rent increases which would follow if the ‘ ‘ most recent ” equalization rates were applied to current assessments (L. 1962, ch. 21, § 1, subd. 2). Unquestionably, the protection of the public against such increases in a time of a rental housing shortage is a valid legislative purpose (see Bowles v. Willingham, 321 U. S. 503, supra; Block v. Hirsh, 256 U. S. 135, supra; Teeval Co. v. Stern, 301 N. Y. 346, cert. den. 340 U. S. 876, supra; People ex rel. Durham Realty Corp. v. La Fetra, 230 N. Y. 429, app. dsmd. 257 U. S. 665, supra), and the Legislature adopted a reasonable means of effectuating it by restoring the use of the 1954 rates. Consequently, its action in so doing is invulnerable to attack on due process grounds.
We turn, then, to the appellants’ contention that the 1962 amendment deprived them of equal protection of the laws. The statute is clearly not discriminatory on its face. It treats all landlords alike; each is entitled to a 6% return on the assessed valuation of his property, as adjusted by the 1954 equalization rate.
It is contended, however, that the statutory scheme results in inequality as between landlords and tenants in different assessing units since the ratio between 1954 and 1961 equalization rates is not uniform throughout the State. This may be illustrated by a comparison of the equalization rates for apartment houses in the cases before us, as shown by the following table.

By application of the 1954, as opposed to the 1961, equalization rates, landlords in New Rochelle, where the rates went np between 1954 and 1961, are benefited, while landlords in Hemp-stead and Mount Vernon, where the rates went down during *477 this period, are hurt.[4] Moreover, since equalization rates dropped more sharply in Mount Vernon than in Hempstead, landlords in the former community are hurt to a greater degree than those in the latter.
We may assume that similar inequalities, perhaps not as pronounced, exist amongst other communities subject to rent control since, as already noted, although there has been a general drop in the level of equalization rates between 1954 and 1961, there is no direct and constant mathematical relationship between 1954 and 1961 rates for individual communities. However, we fail to see in this any violation of equal protection of the laws. The fact that the 1954 equalization rates do not reflect the full underassessment in certain areas is unfortunate, but it had to be viewed by the Legislature in the light of the effect on tenants generally if the revised rates were used. The circumstance that, in carrying out the scheme devised by the Legislature, a particular landlord or tenant may suffer is not sufficient to stamp the method selected as discriminatory or render the statute unconstitutional. (See Bowles v. Willingham, 321 U. S. 503, 516-517, supra; Teeval Co. v. Stern, 301 N. Y. 346, 362, cert. den. 340 U. S. 876, supra.) “ A classification having some reasonable basis does not offend against [the equal protection] clause ”, the Supreme Court observed, “ merely because it is not made with mathematical nicety or because in practice it results in some inequality.” (Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 78, quoted with approval in Morey v. Doud, 354 U. S. 457, 463; see, also, People v. Friedman, 302 N. Y. 75, 80.)
Such inequalities as are here shown are inevitable in the administration of a comprehensive regulatory plan such as our rent control laws. Considerations of practicality and feasibility led the Legislature to limit the valuation base for ‘ ‘ fair return ” rent increases to simple, objective and readily ascertainable equalized assessed valuation or sales price and exclude appraisals and other valuation indicia which may be considered in condemnation and tax certiorari proceedings. (See 1961 Report of New York State Temporary Commission to Study *478 Rents and Rental Conditions [N. Y. Legis. Doc., 1961, No. 23], pp. 18-19; see, also, Matter of Realty Agency v. Weaver, 7 N Y 2d 249, 255.) As the Supreme Court pointed out in the Willingham case (321 U. S. 503, 517, supra), “ any attempt to fix rents, landlord by landlord, as in the fashion of utility rates would have been quite impossible. * * * Such considerations of feasibility and practicality are certainly germane to the constitutional issue.”
In the case before us, the Legislature had reasonable warrant for believing that the use of the “most recent” equalization rates would result in such a wave of rent increases as seriously to impair the objective sought to be attained by the rent control program. It was the Legislature’s task to use a fair and feasible means of accomplishing its concededly valid objective. Acceptance of the appellants’ alternative—use of “most recent” rates — though more logically appealing than the use of rates of another year, would have defeated the legislative purpose of preventing excessive rent increases. Having in mind all relevant factors, the Legislature made a valid choice and achieved a proper balance when it restored the use of the 1954 rates. The inequalities which may have resulted from its choice do not amount to a violation of any constitutional principle. Indeed, this conclusion, if not dictated, was foreshadowed by two of our decisions which also involved the utilization of equalization rates other than the current or most recent ones. (See Matter of Four Maple Drive Realty Corp. v. Abrams, 2 A D 2d 753, motion for leave to app. den. 2 N Y 2d 707, app. dsmd. 2 N Y 2d 837, app. dsmd. 355 U. S. 14; Matter of Baldwin Gardens v. Weaver, 2 A D 2d 753, motion for leave to app. den. 2 N Y 2d 707.)
The judgments appealed from should be affirmed, with costs.

. The challenged statutory provision is not applicable to New York City, since the city has enacted its own rent control law pursuant to authority granted by the Legislature (L. 1962, ch. 21, § 1; see I. L. F. Y. Co. v. City Rent & Rehabilitation Administration, 11 N Y 2d 480, also decided today).

. An equalization rate reflects the relationship of the total assessed valuation of taxable property in a locality to the aggregate full value of those properties. In other words, the equalization rate “ indicates the percentage of full value at which the assessor in a locality is assessing, on the average ”, taxable property in his locality. (State Board of Equalization and Assessment, Principles and Procedures Used in Establishing State Equalization Rates [Feb., 1961], pp. 4-5; see Matter of Town of Smithtown v. Moore, 11 N Y 2d 238.) It does not purport to measure the ratio of assessed valuation to full value of any individual property.

. Two of the instant eases clearly indicate this impact. In Bucho, equalization rates fell from 95% to 71%, resulting in a potential rent increase of $12,02-3.48; in Victory, equalization rates fell from 67% to 57%.

. This follows from the fact that there is an inverse relationship between the equalization rate used and the ultimate valuation arrived at. The lower the equalization rate, the higher the value on which the landlord is entitled to a 6% return.