William C. Hecht, Jr., J.
This and the companion article 78 proceeding seek judicial review of a determination made by respondent City Rent and Rehabilitation Administrator, fixing maximum rents for certain parcels of land located in The Bronx.
Bach of these 250 parcels was vacant land at the time when it was first rented, which was prior to May 1, 1950. Each tenant placed upon the rented land his own structure, designed exclusively for one-family occupancy. The one-family house on each of the parcels in question was vacant on October 1, 1953 or became vacant thereafter, and was purchased and acquired by the present tenant after that date.
The Administrator grounded his determination on section Y51-3.0 (subd. e, par. 1) of the Administrative Code of the City of New York, which includes in “ housing accommodations ” which are subject to rent control “ any plot or parcel of land (as distinguished from any building constructed or placed thereon) which is not owned by the city and which was rented prior to May first, nineteen hundred fifty, for the purpose of permitting the tenant thereof to construct his own private dwelling * * * thereon and on which there exists such a private dwelling owned and occupied by a tenant of such plot or pared ”. The statute further provides for exemption from rent control of housing accommodations in one- or two-family houses which were or shall become vacant on or after April 1, 1953, provided, however, that this exemption shall remain effective only so long as the housing accommodations are not occupied for other than single-family occupancy (Administrative Code, § Y51-3.0, subd. e, par. 2, subpar. [i], cl. [4], repeated in Rent, Eviction and Rehabilitation Regulations, § 2, subd. f, par. [12]).
The landlord’s petition to reverse the determination which denied its protests regarding the above-described parcels is based on two contentions:
1. Neither the State Legislature nor the City Council could constitutionally impose rent control on these parcels of land.
2. If the parcels could constitutionally be placed under control, they were subject to decontrol pursuant to the foregoing subdi *162 vision e (par. 2, subpar. [i], cl. [4]), and section 2 (snbd. f, par. [12]) of the regulations.
In support of both contentions, it is argued that respondent’s action so discriminates against petitioners— as compared to the other landlords of realty on which one-family homes are erected — as to amount to a deprivation of equal protection of the laws.
A. The Constitutional Issue
The Federal rent control laws included in the definition of controlled “housing accommodations” not only “any building, structure, or part thereof, or land appurtenant thereto ” but also 4 4 any other real or personal property rented or offered for rent for living or dwelling purposes ” (U. S. Code, tit. 50, Appendix, § 1892, subd. [b]). The instant parcels as well as all other land in the nation “ rented or offered for rent for living or dwelling purposes ” were therefore subject to such control. At the time when the State assumed jurisdiction over residential rent control in 1950, the statute defined controlled 1 4 housing accommodations ” as confined to “ any building or structure, permanent or temporary * * * together with the land and buildings appurtenant thereto ” (Emergency Housing Rent Control Law, § 2, subd. 2; L. 1946, ch. 274, as amd.). In 1961, this statute was construed as not including the rentals on the land herein (Matter of Clason Mgt. Co. v. Kerman, 29 Misc 2d 258, affd. 14 A D 2d 765, affd. 10 N Y 2d 1022).
Presiding Justice Botein dissented, saying (14 A D 2d at p. 768) “ [The Administrator’s] statement that 4 Housing units of this sort were known to constitute the sole and permanent dwelling of a considerable number of persons ’ is uncontradicted, as is his statement that4 this problem is not confined to this particular development herein in The Bronx, but also exists in various other parts of the city such as Rockaway, Coney Island and Staten Island and also in Westchester. A very substantial number of tenants are affected.’ ”
Judge Fuld also dissented on the basis of the foregoing dissenting opinion (10 N Y 2d at p. 1024).
Immediately following upon that decision, the Legislature enacted chapter 126 of the Laws of 1962, effective March 10. That expanded the definition of controlled44 housing accommodations ” to include 44 any plot or parcel of land which had been rented prior to May first, nineteen hundred fifty, for the purpose of permitting the tenant thereof to construct or place his own dwelling thereon, unless exempt or excluded from control pursuant to any other provision of this act ”. This legislation had been requested by the State Rent Administrator in view of the decision of the Court of Appeals in the Clason Point case *163 (L. 1962, eh. 126, Note; see, also, Report of the New York State Temporary Commission to Study Rents and Rental Conditions, N. Y. Legis. Doc., 1962, No. 15, p. 14).
In approving the bill, Governor Rockefeller stated:
11 This bill bridges a gap that has recently been found by the Court of Appeals to exist between the State Emergency Housing Rent Control Law enacted in 1950 and the Federal rent control laws that were in effect prior to that time.
‘1 Under previously-existing Federal law, housing accommodations subject to rent control included any real property rented or offered for rent for living or dwelling purposes. Thus, prior to 1950, vacant, rented lands upon which tenants were permitted to construct their own dwellings, were subject to rent control.
“ The definition of housing accommodations adopted by the Legislature when the State took over housing rent control in 1950, differed from the Federal definition and gave rise to litigation concerning the authority of the State Rent Administrator to fix maximum rentals or stay evictions from vacant, rented lands upon which tenants had constructed their own dwellings. 1 ‘ The Court of Appeals recently ruled that such lands are not subject to rent control under existing State law, even though they were previously subject to rent control under Federal law. As a result of this court decision, approximately 2,000 families in New York City and Westchester are reported now to be facing unwarranted rent increases and possible eviction.
‘ ‘ The Legislature has acted wisely to prevent these harsh consequences to the families concerned.” (N. Y. Legis. Annual, 1962, p. 316.)
Chapter 21 of the Laws of 1962 contains the following legislative finding: “ The legislature hereby finds that a serious public emergency continues to exist in the housing of a considerable number of persons in the state of New York which emergency was created by war, the effects of war and the aftermath of hostilities; that such emergency necessitated the intervention of federal, state and local government in order to prevent speculative, unwarranted and abnormal increases in rents; that there continues to exist an acute shortage of dwellings; that unless residential rents and evictions continue to be regulated and controlled, disruptive practices and abnormal conditions will produce serious threats to the public health, safety and general welfare ; that to prevent such perils to health, safety and welfare, preventive action by the legislature continues to be imperative; that such action is necessary in order to prevent exactions of unjust, unreasonable and oppressive rents and rental agreements and to forestall profiteering, speculation and other disruptive *164 practices tending to produce threats to the public health; that in order to prevent uncertainty, hardship and dislocation, the provisions of this section are necessary and designed to protect the public health, safety and general welfare, that the transition from regulation to a normal market of free bargaining between landlord and tenant, while still the objective of state policy, must be administered with due regard for such emergency; and that the policy herein expressed should now be administered locally within cities having a population of one million or more by an agency of the city itself.”
The statute then provided that “ When it deems such action to be desirable or necessitated by local conditions in order to carry out the purposes of this section such city [having a population of one million or more] is hereby authorized and empowered to adopt and amend local laws or ordinances effective on or after May first, nineteen hundred sixty-two in respect of the regulation and control of residential rents, including but not limited to provisions for the establishment and adjustment of maximum rents, the classification of housing accommodations, the regulation of evictions, and the enforcement of such local laws or ordinances.”
Pursuant to this delegation of authority, the City Council passed Local Law No. 20 of 1962. It contains a legislative finding identical in all material respects with that in chapter 21 of the Laws of 1962 (Administrative Code, § Y51-1.0, subd. a). It then added (subd. b): “ The council further declares that it is city policy to utilize the powers conferred by this title, in a manner consistent with the purposes and provisions thereof, to encourage and promote the improvement and rehabilitation of the housing accommodations subject to control hereunder, for the purpose of protecting the health, safety and general welfare.”
It then defined controlled “ housing accommodations ” in the language set forth supra, for the reasons stated in the report of its Committee on General Welfare (Baker, Voorhis: New York City Bent Control, 1966 ed., p. 328): “ 3.a. Express language has been inserted in the bill to control land leased prior to May 1,1950, to a tenant for the purpose of constructing his own dwelling. Until the contrary decision of the Court of Appeals in the case of Clason Management Corp. v. Herman (14 A D 2d 765, affd. 10 N Y 2d 1022), it had been the policy of the State Bent Administrator to consider such land leases as being subject to control. This provision protects those tenants formerly protected by State policy and is similar to a recently enacted amendment to the State law which will place these tenants under control until the City take-over date.”
*165 Petitioners’ argument of unconstitutionality is directed primarily against chapter 126 of the Laws of 1962. This overlooks the fact that respondent’s determination, is not grounded on that statute but rather on Local Law No. 20. This local law, passed pursuant to an explicit delegation of authority by the Legislature on the basis of its declaration and finding of emergency quoted above, restated the emergency which the Legislature had found to exist when the State took over residential rent control.
This declaration found the emergency to have been created not only by the war (which petitioners emphasize had terminted in 1945), but by the “ effects of war and the aftermath of hostilities.” It found “ that a serious public emergency continues to exist in the housing of a considerable number of persons in the city ” (§ Y51-1.0).
This court may not substitute its judgment for that of the City Council so long as there can be discovered any state of facts either known or which could reasonably be assumed to afford support for the Legislature’s decision to act (Lincoln Bldg. Assoc, v. Barr, 1 N Y 2d 413, 415; see, also, East New York Sav. Bank. v. Hahn, 293 N. Y. 622, 627-628, affd. 326 U. S. 230, 234; I. L. F. Y. Co. v. Temporary State Housing Bent Comm., 10 N Y 2d 263, 269-270; Teeval Co. v. Stern, 301 N. Y. 346, cert, den. 340 U. S. 876). The constitutionality of Local Law No. 20 of 1962 was specifically sustained in I. L. F. Y. Co. v. City Rent and Rehabilitation Administration (11 N Y 2d 480).
Petitioners argue that the imposition of such controls could have been justified only if there was in 1962 a grave shortage of vacant land in the State and City of New York on which one-family houses could be erected or placed. There is no proof anywhere that any such shortage actually existed and neither the Legislature nor the Council ever made any such finding.
But it was not necessary for either the City Council or the Legislature to find a shortage throughout the City and State of vacant land suitable for the construction of one-family houses. It was not an unreasonable classification for the Legislature to confine the statutory protection to land which was rented prior to May 1, 1950 for the purpose of permitting the tenant to construct his own private dwelling thereon, on the basis of the facts set forth in Governor Rockefeller’s message of approval (supra) and of Presiding Justice Boteiu’s dissent (supra).
I had occasion to discuss this equal protection issue in Blaikie v. Lindsay (49 Misc 2d 612, 616-619). It is sufficient to say that here, as in that case, the point of “ invidious discrimination” has not been reached.
*166 Petitioners urge finally that there could he no emergency affecting these houses since they were unprotected from the termination of Federal control in 1950 until the enactment of chapter 126 of the Laws of 1962. This argument overlooks the actualities of the situation. The return of the Administrator and the report of the City Council’s Committee on General Welfare show that in fact these tenants were protected until the decision of the Court of Appeals in the Clason Point case. And, as soon as that disclosed the lack of protection, the Legislature passed the statute to effectuate such protection.
It may be added that even though the respondent’s determination does not depend upon chapter 126 of the Laws of 1962, there is no merit to petitioners’ contention that such statute is unconstitutional because it does not contain a declaration of emergency. There is such a declaration in chapter 21 of the Laws of 1962 which became effective 21 days prior to the effective date of chapter 126. This declaration was a sufficient basis for the enactment of the latter statute.
B. The Decohtrol Issue
The Administrator correctly ruled that the “ housing accommodations ” involved herein were not subject to decontrol under section Y51-3.0 (subd. e, par. 2, subpar. [i], cl. [4]), and section 2 (subd. f, par. [12]) of the regulations. These authorized decontrol only of “ one or two-family houses ” and not of the land under the houses, which land is the “ housing accommodation ” subject to control.
Here again it was not an “ invidious discrimination ” of the City Council, when it authorized decontrol of one and two-family houses, not to include in such decontrol land in the classification involved herein.
The reason for the decontrol is thus explained in Matter of Castleton Estates v. Abrams (1 A D 2d 390, 391): “ There is some indication of the legislative intent in the Report of the New York State Temporary Commission to Study Rents and Rental Conditions (Legislative Annual, 1953, p. 439; N. Y. Legis. Doc., 1953, No. 43, p. 17), to the Legislature which is captioned, ‘ Special adjustment for small property owners ’. Concomitantly thereto, it appears that the relief was recommended because owners of small properties require rent adjustment in excess of the other rent increases granted by the Legislature to compensate for larger operating expenses for such owners in comparison to professional operators. Reference was made in these legislative discussions to hardships resulting to ‘ small non-professional landlords ’. It is evident that the Legislature, in the enactment *167 of the measures herein-before discussed, was primarily concerned with giving relief to non-professional owners of one- and two-family houses by way of increased rentals and by decontrol in the event of vacancies. ’ ’
Moreover, the tenants of such houses have no investment therein and therefore can relinquish occupancy without too much hardship if other rental accommodations are available. The Council could reasonably therefore conclude that the bargaining power between landlord and tenant was not so unequal as to warrant exercise of the police power.
In the case at bar, it appears that the maximum rents fixed for each of these parcels of land was $25 per month for the most part. It is apparent that these ‘ ‘ bungalow-type dwellings, for the most part containing four rooms ” (see 14 A D 2d at p. 766), involved an investment by the tenant at least equal to and in many cases exceeding the value of the land. Reduction of family size, through death or departure of children; increase in family size, through births or return of children; changes in employment — any one of these or other factors may necessitate sale of the house.
If rents of the underlying land were decontrolled, the landlord would be free to exact “ unjust, unreasonable and oppressive rents ” which might force the tenant to sacrifice a substantial portion of his investment in order to effectuate a sale. This loss might not be averted by the tenant’s ability to remove the bungalow. The City Council might reasonably have concluded that keeping this type of one- or two-family houses subject to control was necessary in order to “ forestall profiteering, speculation and other disruptive practices tending to produce threats to the public health ”.
The situation here is not dissimilar to that which justified the mortgage moratoria legislation. Provision is made for granting adjustment of these controlled rents in order to avoid inequities (§ Y51-5.0, subd. g; I. L. F. Y. Co. v. City Rent and Rehabilitation Administration, 11 N Y 2d 480).
Petitioners point out that the Administrator did decontrol 7 parcels which were identical to the 250 parcels involved here. These 7 parcels were in the Silver Beach area, owned by the same petitioner. The two determinations are inconsistent. But the fact that the Administrator previously misconstrued the statute in respect of 7 parcels does not mean that he must repeat that mistake here.
The petition to set aside the Administrator’s determination is denied in all respects.