OPINION OF THE COURT
Eve Preminger, J.
Laws most hurt which pinch the purse. Petitioner, a building owner, lamenting that his earnings are being excessively squeezed by Multiple Dwelling Law article 7-C, challenges its constitutionality.
procedural facts
On June 21, 1983, respondent New York City Loft Board received an application from Joan Greenfield, a tenant at 1026 Avenue of the Americas for a determination that the premises constituted an interim multiple dwelling, as defined under article 7-C. Answers were served by other tenants and by petitioner owner Enki Properties. Following an administrative hearing during which each of the participants presented its claims, the Board adopted Loft Board Order No. 59 which granted Ms. Greenfield’s application. Petitioner now seeks judicial review of that order, alleging, first, that the statute is constitutionally infirm, and second, that the Board’s determination was arbitrary, capricious and not supported by substantial evidence.
BACKGROUND TO THE STATUTE
The Loft Law was enacted in 1980 in an attempt to solve an interconnected group of problems which had become increas *487 ingly serious over the preceding 20 years. The abandonment by manufacturers in the 1960’s of such areas of the city as Soho and the garment district for locations outside the State had left city landlords with an abundance of large, empty, and seemingly undesirable factory buildings for which commercial tenants could not be found. Coincidentally, this period saw other areas of the city — Greenwich Village to name one — grow in desirability. As a result, artists who had worked in these neighborhoods found themselves unable to pay the escalating rents which were being obtained for residential units. Forced out of their traditional haunts, these artists turned to the large loft and factory spaces which had become available with the relocation of manufacturers and the demise of other commercial tenants. Landlords were pleased to have artists take over these raw spaces and often collaborated in renovating the premises to suit their new residential tenants. Gradually portions of these neighborhoods began to gentrify and eventually to become affluent, as loft after loft was turned to residential use.
The legal problems which resulted from this process were trifold: first, the widespread use of manufacturing and commercial spaces for residential purposes had made a mockery of the zoning laws. Second, minimum city fire and safety standards had been ignored in the rush to convert these units. Third, tenants and landlords had more often than not entered into commercial rather than residential leases which did not contain the protections afforded by residential housing statutes and regulations.
THE STATUTE
Article 7-C attempts to address these problems by bringing loft housing up to minimum safety standards and by imposing a framework to determine the rights and duties of both landlords and tenants. Its primary aim, however, is to protect the health and safety and welfare of residential tenants by enforcing residential building code regulations (Multiple Dwelling Law § 280).
Multiple Dwelling Law § 282 provides for the establishment of a Loft Board whose members are chosen from the real estate industry, loft residential tenants, loft manufacturing interests and the public. The Board is empowered to grant interim multiple dwelling (IMD) status to structures which had originally been used for manufacturing, commercial, or warehouse purposes but which on December 1, 1981, contained three or more residences having been in existence for the preceding 20 months. Upon the granting of IMD status the statute requires *488 the landlord to cure all legal conditions in the residential portion of the building and furnish proof of compliance with all fire and safety standards (Multiple Dwelling Law § 284). Although the landlord must pay for the initial conversion, he may pass along his costs to the tenant by obtaining a rent adjustment from the Board (Multiple Dwelling Law § 286). The adjustment in rent is determined by amortizing the cost of conversion, exclusive of financing costs, over a 10-year period, or including financing costs, over a 15-year period. (Multiple Dwelling Law § 286 [5].)
A landlord who finds it to his advantage to reconvert the building to commercial use may do so by purchasing a residential tenant’s right to a unit (Multiple Dwelling Law § 286 [12]). Alternatively, a landlord seeking to recoup his investment by taking advantage of higher residential rates may do so in certain instances. A tenant moving out of his residence must offer to sell any improvements he had made to the landlord at market value (Multiple Dwelling Law § 286 [6]). The landlord may then rent out the unit at full market value, provided no more than six residential units exist in the building. If more than six residential units exist, they are eventually subject to rent regulation. Lastly, if the landlord can demonstrate that conversion to residential use would be financially infeasible, he may obtain an exemption from compliance (Multiple Dwelling Law § 285 [2]).
petitioner’s arguments
Petitioner seeks to invalidate the statute on three related grounds.
It has been established for well over half a century that a statute which is not substantially related to a legitimate State purpose is violative of the due process clause. (Village of Euclid v Ambler Co., 272 US 365 [1926]; Nectow v City of Cambridge, 277 US 183 [1928]; Dowsey v Village of Kensington, 257 NY 221 [1931].)
Although petitioner does not deny that in attempting to foster compliance with the fire, health and safety codes and to alleviate a shortage of housing (see, Multiple Dwelling Law § 280) the Legislature has addressed a legitimate State interest (People ex rel. Durham Realty Corp. v La Fetra, 230 NY 429 [1921]; Matter of Wulfsohn v Burden, 241 NY 288 [1925]; Bucho Holding Co. v Temporary State Hous. Rent Commn., 11 NY2d 469 [1962]), petitioner contends that the Legislature has overreached itself in regulating real estate which is used both commercially and residentially, as the statute’s espoused purpose is to rectify a *489 public residential housing emergency (Multiple Dwelling Law § 280; and see, Loft Realty Co. v Aky Hat Corp., 123 Misc 2d 440 [1984]). The Loft Law permits a unit which is used for commercial purposes to be regulated as long as some portion of it serves as the tenant’s residence. The statute thus arbitrarily prohibits the landlord from charging otherwise lawful commercial rent even where a de minimus portion of the space rented is used for residential purposes.
Petitioner also contends that article 7-C is arbitrary, and an unconstitutional exercise of the police power because it is not reasonably related to an actual evil towards which the statute is directed. (Matter of Board of Educ. v City Council, 29 NY2d 681, 682 [1971].)
According to this argument, the statute will not alleviate the housing shortage, but will exacerbate it. The statute requires the landlord to make sizeable outlays of funds in order to gain compliance with its provisions. The landlord can be expected, in short order, to apply to the Loft Board for permission to pass along his costs to the tenants, as provided for by Multiple Dwelling Law § 286. The Board will permit some, if not all, of these costs to be passed along in the form of increased rent. This tide of escalating rents will force present tenants to seek more affordable lodging elsewhere, thus creating hardship and increasing the pool of people searching for reasonably priced apartments.
Petitioner’s last related argument is that the costs on the landlord are unduly and disproportionately burdensome, and that the statute offers the landlord no feasible method of recouping his forced investment in his property (Vernon Park Realty v City of Mount Vernon, 307 NY 493 [1954]; French Investing Co. v City of New York, 39 NY2d 587 [1976]).
He points out that although the landlord may increase rents based on his amortized costs, he may do so only with the approval of the Loft Board, which is under no obligation to grant an increase reflecting actual costs, but may approve any lesser sum it deems appropriate. The Board, states petitioner, is unlikely to pass along the full costs of renovation because they are extraordinarily high. Thus, the incremental cost will necessarily be borne by the landlord. Even if the full costs were passed along to the tenants they would be under no obligation to remain in the building, nor would they be likely to, given the huge increases in rent they would be forced to pay. Should that occur the landlord will be saddled with premises unsuitable for commercial use and unmarketable as residential space because of high rent.
*490 Additional costs incurred by the landlord are suffered in the form of a diminution in market value. When the landlord purchased his property he did so with the expectation that he would one day sell it at a profit. Since petitioner claims that article 7-C has diminished the value of the fee interest, the landlord, upon disposition of the property, will be unable to obtain a price for his property commensurate with that expectation value. He is thus forced to accept minimal return on his investment.
ANALYSIS
Preliminarily, the court notes that much of petitioner’s prognostication regarding the likely effect of article 7-C is without factual foundation. Sheer speculation fuels the contention that the Loft Board will be unwilling to increase a tenants rent to the full extent allowed by the amortization provisions of the statute, and the theory that a tenant will flee his renovated loft once his rent has been increased flies in the face of the fact that New York City is experiencing one of the lowest residential vacancy rates in its history. Additionally, tenants in loft spaces have often made a considerable investment into their units in attempting to convert unsuitable or bare spaces to habitable ones. These tenants are unlikely to suddenly decamp from their apartments, abandoning investments in what are increasingly desirable buildings.
If a particular tenant cannot afford the increase, he is likely to find someone else who will be more than happy to pay the price. The landlord may also be able to purchase and deregulate the unit in such a situation, or return it to commercial use. Lastly, in hardship situations the landlord may request an exemption.
But even assuming, arguendo, that petitioner foresees future events with great clarity, no legal basis exists for his arguments.
First, although a statute may be burdensome, it is only constitutionally infirm when it leaves the property with no “reasonable income productive or other private use for which it is adapted” leaving it with “but a bare residue of its value”. (French Investing Co. v City of New York, supra, at p 596; Northwestern Laundry v Des Moines, 239 US 486 [1915].) That is clearly not the case here, where the landlord may still operate his building, pass along his costs and receive an economic return. Second, as to the constitutional argument that the statute will only make the housing crisis in New York City more severe, it is sufficient to note that if it is the finding of the Legislature that article 7-C will alleviate the crisis it is not for the court to find otherwise: “[0]nce it has been ascertained that *491 there is an actual and manifest evil to which the challenged legislation bears a reasonable relation, the courts may not dictate to the legislative body the choice of remedy to be selected; questions as to wisdom, need or appropriateness are for the Legislature.” (I. L. F. Y. Co. v City Rent & Rehabilitation Admin., 11 NY2d 480, 489-490 [1962].)
As previously stated, it is beyond cavil that the interests addressed by the statute, housing, safety and health, are legitimate ones and even a cursory examination of the specific provisions of the article show them to be reasonably related to the ends sought to be achieved. (See also, Lipkis v Pikus, 122 Misc 2d 136,145 [1983], affd 122 Misc 2d 833 [App Term, 1st Dept 1983], revd on other grounds 103 AD2d 682 [1st Dept 1984].) That being the case, the court may not challenge the Legislature’s acumen or second-guess the efficacy of the remedy chosen (Eisen v Eastmen, 421 F2d 560 [2d Cir 1969]).
Much the same analysis answers the contention that article 7-C improperly regulates commercial rents.
It is not as petitioner claims, that article 7-C regulates commercial rents, because the statute is silent as to what would happen should a tenant use a portion of his residence for other purposes.
There is no denying that the landlord may, in some situations, be forced to charge less than the commercial market rate for space which is being used commercially, but this result occurs as the incidental by-product of processes which are completely independent, i.e., neither encouraged nor discouraged, by the statute.
Moreover, the tenant who seeks to abuse the statute and uses an inconsequential portion of his unit for residential purposes may not be covered by the Loft Law (Loft Realty Co. v Aky Hat Corp., supra). The tenant who operates a commercial enterprise while maintaining his primary residence elsewhere may be evicted (Matter of Lower Manhattan Loft Tenants v New York City Loft Bd., 104 AD2d 223 [1st Dept 1984]).
In regard to less abusive situations, the Legislature was not oblivious to the fact that loft spaces are often used for both living and working purposes (1982 McKinney’s Session Laws of NY, at 2484), but it chose not to give the landlord a greater return in those cases just as it declined to adopt any other formulation which might have resolved this concern. It may be that the Legislature did unfairly slight the landlowner’s interest in this way, but it had the right to do so.
*492 The court is not free to overturn legislation merely because alternatives to the Legislature’s solutions exist nor is it empowered to act as a superior legislative chamber, substituting its own judgments for the desires of the litigants who come before it for solutions given the force of law by the Legislature (East N. Y. Sav. Bank v Hahn, 293 NY 622 [1944]; Matter of Federated Homes v Berman, 56 Misc 2d 160 [1968], affd 31 AD2d 624 [1st Dept 1968]). Thus, that the landlord may be receiving less than the market rate for commercial properties in situations in which a portion of residential premises are being used commercially weighs only as to the equities of the statute, and not as to its constitutionality (Queenside Hills Co. v Saxl, 328 US 80 [1946]; California Auto Assn. v Maloney, 341 US 105 [1951]).
The same argument applies to petitioner’s complaint that the resale value of his investment has been diminished and that he will not be able to obtain his expected rate of return on his investment. (Day-Brite Light, v Missouri, 342 US 421 [1952].) There is no constitutionally guaranteed rate of return on investment. (I. L. F. Y. Co. v City Rent & Rehabilitation Admin., supra.)
The court turns briefly to petitioner’s remaining contentions: article 7-C does not violate article I, § 10 (1) of the Constitution because the statute is reasonable and necessary to serve an important and legitimate purpose for the general welfare (Home Bldg. & Loan Assn. v Blaisdell, 290 US 398 [1934]). Thus, although the statute may be said to impair contracts between landlords and tenants, it does not do so improperly because every contract is made subject to the lawful exercise of the police power (Matter of Farrell v Drew, 19 NY2d 486 [1967]).
Neither is the statute violative of the equal protection clause. The provisions of the legislation create classifications but they cannot be said to do so arbitrarily and without relationship to legitimate government interests (Frontiero v Richardson, 411 US 677 [1973]). Owners of commercial buildings which now house residential tenants are singled out because their buildings present particular problems in terms of fire and safety code violations, have brought about extensive litigation, and because the owners often colluded with tenants to bring about the conditions sought to be remedied (Corris v 129 Front Co., 85 AD2d 176 [1st Dept 1982]; Kaufman v American Electrofax Corp., 102 AD2d 140 [1st Dept 1984]). It is, therefore, entirely rational that building owners who benefited from an influx of residential tenants now be made to pay the costs stemming from *493 the presence of those tenants so that they may continue their residence in safety. The rent regulation provisions are rational on a similar rationale: the landlord who was able to obtain an economic return because his space was rented at a time when tenants were scarce is not unjustly marked by the statute in being forced to subsidize rents today.
The statute affords building owners procedural due process in providing them notice of and access to a full and fair hearing, the right to call and cross-examine witnesses, to adduce and rebut evidence (Langevin v Chenango Ct., 447 F2d 296 [2d Cir 1971]). Petitioner’s argument that in no case will a landlord be able to rebut the tenant’s proofs is unpersuasive and, even if true, not the fault of the statute.
The court has examined the minutes of the hearing of February 9, 1984 and finds that the record contains substantial evidence to support the Board’s finding (300 Gramatan Ave. Assoc. v State Div. of Human Rights, 45 NY2d 176 [1978]).
Petitioner’s motion to annul the determination of the Loft Board is, accordingly, denied. The cross motion by the named residential tenants seeking leave to intervene is denied as moot.