OPINION OF THE COURT
Robert D. Lippmann, J.
The issue presented is whether in order to be protected by the Loft Law, permanent physical alterations to convert loft space to residential use are statutorily required of a tenant actually living in loft quarters.
*997 This is a holdover proceeding based on lease expiration in which the landlord seeks to recover possession of two rooms in a loft building.
The building is at 648 Broadway, located in the No-Ho district of Manhattan, governed by the MI-5B local zoning resolution. It has three residential units covered by the Loft Law, none of which is on the tenth floor. The tenth floor is occupied by respondent and nine other tenants who lease space for commercial use. Respondent’s lease, a “standard form of Loft Lease,” specifies the premises are to be used only as an artist’s studio. It expired November 1978. Landlord served a 30-day notice of termination December 22, 1983. Respondent did not vacate. Respondent alleges that he is a residential tenant of the premises, protected by the provisions of Multiple Dwelling Law article 7-C and that these proceedings, therefore, cannot be maintained.
THE FACTUAL DISPUTE
In opposition to this contention, petitioner offered into evidence a lease made out to respondent and his former wife, Amanda McMurray Rios, for apartment 15 at 324 East 6th Street, New York City. In 1981, respondent had submitted this lease to petitioner as proof he was not using petitioner’s premises for residential purposes. Respondent credibly testified that fear of losing his work/living space had motivated him to reassure the landlord in this manner. The court notes that the East 6th Street lease was executed by only Amanda McMurray Rios, not by respondent. Mr. Rios, a legal alien, testified that since 1978 he has listed 648 Broadway as his place of residence with the Department of Immigration and Naturalization. Submitted into evidence is a document with the official seal of the Consulate of Argentina attesting to respondent’s residence since December 19, 1979 as being 648 Broadway.
Reviewing the evidence and the credible testimony, I am convinced respondent has in fact been using the premises at issue for residential purposes since 1978 or 1979. Whether such was open or surreptitious is immaterial (see, Kaufman v American Electrofax Corp., 102 AD2d 140 [1st Dept 1984]), as is whether it is in violation of a lease provision (see, Multiple Dwelling Law, art 7-C, § 286 [1]).
THE LEGAL DISPUTE
Respondent is an artist. He sleeps on a cot, prepares his meals on a hot plate, has two machines that furnish hot and cold running water, walks out of his rooms, down the common hall to *998 the bathroom, and across the street to the New York University health club to shower. In addition to the cot, hot plate, the hot and cold water refrigerators, there are two chairs, a table and a closet in the small room. The large room is furnished with a table, chair, easel, two workhorses, storage space for large canvasses and various tools and equipment relating to painting. There is residential phone service but no gas service. Respondent has made no physical improvements to the premises. The total combined space measures 625 square feet.
Petitioner contends that article 7-C splits the burden of conversion to residential units between the landlord and the tenant, with the tenant responsible for “creating” a residential unit, and landlord responsible for “legalizing” an existing residential unit. According to this contention, there must be on the part of the tenant more than mere residential use, there must be a physical alteration of the space to render it amenable to residential use.
It is undeniable that the expense incurred by some loft tenants in transforming raw commercial or manufacturing space into living quarters was a spur for the enactment of the Loft Law. However, the issue here is whether there is a statutory obligation requiring a tenant to make permanent improvements to a loft space or whether a change to residential use, without more, is sufficient to bring a loft tenant under the protection of the Loft Law.
Under the provisions of Multiple Dwelling Law, article 7-C, § 281 (1), the Loft Law, an interim multiple dwelling means a building or any part thereof which (1) at any time was occupied for manufacturing, commercial or warehouse purposes; (2) lacks a certificate of compliance or occupancy and (3) on December 1, 1981 was occupied for residential purposes since April 1,1980 as the residence or home of any three or more families living independently of one another.
These are the only governing criteria for qualification. (Kaufman v American Electrofax Corp., supra.)
The first two prongs are not in dispute. The only question is what is meant by occupancy “for residential purposes?”
Judicial interpretation of article 7-C inevitably traces a helter skelter pattern. As courts are constitutionally limited to resolve only those issues brought before the Bench, a comprehensive, systematic interpretation of the Loft Law is not to be expected. Two cases, however, are tangentially relevant to the issue before me. In Kachian v Aronson (123 Misc 2d 743 [Civ Ct, NY County 1984]), the court held that the warranty of habitability applied *999 to interim multiple dwellings but that the obligation of meeting the standards of the warranty fell not universally on the landlord, as is usual in residential housing, but fell rather on the landlord or the tenant depending on whether the one or the other had installed the vexatious fixture. In Ten Be Or Not Ten Be v Dibbs (NYLJ, June 12, 1985, p 11, col 1), the Appellate Term, First Department, considered whether a joint work/living unit fell under the purview of the Rent Stabilization Law. The unit in question — like the one at bar — had no kitchen per se and the toilet was located outside the unit, in the common hallway. Whether there had been a conversion to residential use was not central to the case, but that the unit was a residential one must necessarily be subsumed under the issue since rent regulation laws apply only to residential units and the court found that the rent stabilization laws did apply.
While neither case squarely confronts occupancy for “residential purposes” within the Loft Law’s provisions, both cases illustrate the range of possible physical conversions contained within the concept of residential use. There is obviously no fixed point on the continuum that signals the moment of legal conversion.
Petitioner urges me to be guided by the Loft Board’s ruling in Matter of Bal (Loft Board order No. 153, Dec. 19,1984) in which under facts similar to the instant case, the Board stated, “With the removal of the occupant and his personalty, the space would have been unquestionably an empty office — without a vestige of residential character * * * If the only requirement to establish a residential unit were that heretofore commercial or manufacturing space had been ‘lived in,’ the legalization requirement of Article 7-C would compel the owner not to conform or complete an existing residential conversion to the requirements of law, but to create totally a residential unit out of unconverted space. There is nothing in Article 7-C to compel that result.”
The Loft Board was legislatively established by article 7-C and authorized to resolve complaints between owners and tenants and to act upon hardship applications. Among its duties are the determination of interim multiple dwelling status and other issues of coverage (Multiple Dwelling Law § 282). There is no question that the Board is to be given the respect and deference of an agency with expertise in its delegated sphere of authority. (Korn v Gleich, NYLJ, Feb. 17, 1984, p 6, col 3 [App Term, 1st Dept].) Nevertheless, the Board’s ruling with respect to a specific matter is not controlling on this court in resolving a case appearing here. Nor is the Board a proper forum for the inter *1000 pretation of statutory law. “ ‘[Statutory construction is the function of the courts’ ”. (Lower Manhattan Loft Tenants v New York City Loft Bd., 104 AD2d 223, 224 [1st Dept 1984].)
It is essential in construing statutory provisions that proper consideration be given to the legislative purpose of the statute and the objectives sought to be accomplished by the Legislature. (Abood v Hospital Ambulance Servs., 30 NY2d 295 [1972].) In this context, a review of the history leading to the enactment of the Loft Law is useful. In the 1960’s and 1970’s New York City underwent a massive reduction in its once predominant manufacturing base. Between 1969 and 1976 over 300,000 jobs were lost in the manufacturing industries. (New York Times, June 30, 1985, at 1, col 1, see, p 32.) Space once leased to manufacturers now stood vacant and useless. Artists and others moved into the large lofts left behind by the exodus and acquired work/living spaces at low rents from landlords who were happy to have any tenants at all. (New York Times, May 12, 1985, Real Estate section, at 1.) These pioneers revitalized grimy regions of the City and in the wake of that revitalization they and later comers carved out new pockets of desirable realty whose value consequently soared. The prime beneficiaries of this rising market are the owners. Quite naturally, they desire to realize their monetary gain.
The clash that ensued between the interests of the loft tenants and landlords brought about the enactment in 1982 of Multiple Dwelling Law article 7-C — the Loft Law. The Legislature found and declared a serious public emergency created by the conversion of commercial and manufacturing loft buildings to residential use without compliance to zoning laws or minimum housing maintenance standards. The Legislature further found “that as a consequence of the acute shortage of housing * * * the tenants in such buildings would suffer great hardship if forced to relocate; that as a result of the uncertain status of the tenancy in question the courts have been increasingly burdened with disputes between landlords and tenants regarding their respective rights and obligations under the existing circumstances * * * that the intervention of the state and local governments is necessary to effectuate legalization * * * of the present illegal living arrangements * * * and to establish a system whereby residential rentals can be reasonably adjusted so that residential tenants can assist in paying the cost of such legalization without being forced to relocate; that in order to prevent uncertainty, hardship, and dislocation, the provisions of this article are necessary and designed to protect * * * health, safety and general welfare.” (Multiple Dwelling Law, art 7-C, § 280.)
*1001 The legislation is remedial in nature (Kaufman v American Electrofax Corp., 102 AD2d 140, supra), intended to safeguard the residence of those in possession (Lipkis v Pikus, 103 AD2d 682 [1st Dept 1984]) and designed in large measure for the protection of tenants (Vlachos v New York City Loft Bd., NYLJ, Mar. 13, 1985, p 7, col 1 [Sup Ct, NY County]). The protection afforded tenants is against involuntary relocation and against the hazards of unsafe living conditions. I find no intent in the legislative objectives to justify a construction of the statute that requires tenants to install fixtures or make permanent improvements to loft spaces as a precondition to admission to the Loft Law’s protection. It is true that discussions of alterations and installation of permanent fixtures repeatedly crop up in decisional law, but generally they are used to support the inequity of evicting a tenant after he has made a substantial investment that enhances the owner’s property, or as a way of substantiating whether a loft tenant is in fact making residential use of the premises.
Obviously, if the tenant has made no improvements, the landlord must shoulder a costlier burden in legalizing the loft space to bring it into code compliance. Article 7-C, however, has envisioned this situation by providing for cost sharing, rent adjustments and hardship exemptions (§§ 285, 286). The landlord is required by section 284 to take all necessary action and pay the initial costs of obtaining a certificate of occupancy and of compliance. The law allows these costs to be passed on to the tenants over a 10- or 15-year period. (Wagner v Haddad Corp., NYLJ, Apr. 27, 1983, p 7, col 3 [Sup Ct, NY County].)
That the Loft Law may be burdensome to owners is not without some foundation. The claim has already been the basis of a challenge to its constitutionality. (Enki Props, v Loft Bd. of City of N. Y., 128 Misc 2d 485 [Sup Ct, NY County].) In dismissing the challenge, Justice Preminger wrote (pp 492-493), “It is * * * entirely rational that building owners who benefited from an influx of residential tenants now be made to pay the costs stemming from the presence of those tenants so that they may continue their residence in safety.”
Respondent at bar has continuously lived in his loft since 1978 or 1979. The purpose of the provision as declared by the legislative findings is to protect the very class of which respondent is a member. Moreover, as an artist he is also protected by Multiple Dwelling Law article 7-B, promulgated to keep New York City a viable, thriving art center of the world. Though he lives with bare amenities, it is not for courts to pass judgment on *1002 the personal living habits and standards of tenants, nor to impose them. It is this court’s task to assess the sufficiency of residential use of loft space for Loft Law purposes. Section 281 (1) is devoid of language requiring physical conversion. All it demands is occupancy for residential purposes and if more were required, more would have been announced. Therefore, I rule today that article 7-C does not require loft tenants to make permanent improvements or otherwise make physical alterations to loft spaces before entitling them to the protection of the Loft Law. Where there is furniture, however meager, and an arrangement of the furniture to indicate living quarters and a loft tenant actually making residential use of the space on a permanent basis during the window period, all that is statutorily required by section 281 (1) (iii) has been met. Respondent herein meets all the criteria of section 281 (1). Hence the premises qualify as an interim multiple dwelling and are protected by the Loft Law.
Finally, petitioner challenges respondent’s residential use under Zoning Resolution § 4317 applicable to a MI-5B zone. It states: “No building containing joint living-work quarters for artists shall be subdivided into quarters of less than 1200 square feet except where no story contains more than one joint living-work quarters for artists.”
Petitioner claims Aguilar v Rabin (128 Misc 2d 428 [App Term, 1st Dept]) supports its thesis, but Aguilar is not on point. In Aguilar the tenant had subdivided the loft space and had sublet a portion thereof. The court held that a sublessee of less than 1,200 square feet of interior floor space was not protected by the Loft Law from eviction by the sublessor who needed the space subleased to add to her own in order to comply with the 1,200-square-feet space requirement of the zoning resolution.
Respondent concedes that his space measures significantly less than 1,200 square feet. However, the zoning resolution has no application here since the case falls within the exception, as on the tenth story, there is only one joint living-work space, that of respondent, and in any event, there has been no subdivision.
Also worth noting is that the Loft Board will not disqualify an applicant from coverage on the basis of a unit’s size where there has been a showing of a conversion to residential use. In Matter of Matt (Loft Board order No. 22, Oct. 19,1982) a residential unit of approximately 500 square feet was found to be covered by the Loft Law where the zoning regulations require a 1,200-square-foot space minimum.
In accordance with all the above-stated reasons, the petition is dismissed.