OPINION OF THE COURT
Marilyn Shafer, J.
This case comes before this court at a time when, according to the New York Times, homeless families in city shelters are at a record high, and the gap between average income and rent continues to grow. (Lee, Homeless Families in City Shelters Hit Record, Despite the Mayor’s Efforts, New York Times, Mar. 8, 2007, section B, col 1, at 1.) In this action, plaintiff Real Estate Board of New York, Inc. seeks a declaratory judgment finding that Local Law No. 79 (2005) of the City of New York (adding Administrative Code of City of NY § 26-801 et seq.) is illegal and void as: (1) preempted by New York State and federal housing laws, and (2) in violation of the Eminent Domain Procedure Law, and the Takings, Due Process and Equal Protection clauses of the United States and New York State constitutions. The Real Estate Board also seeks preliminary and permanent injunctive relief.
In this motion, the Real Estate Board moves for summary judgment. Defendants City of New York and New York City Department of Housing Preservation and Development (HPD) support the Real Estate Board’s motion. Defendant City Council of the City of New York cross-moves for summary judgment declaring both that Local Law 79 is valid and that HPD must issue regulations pursuant to that law.
Local Law 79, which was passed by the City Council on August 17, 2005 and became effective on November 15, 2005, was intended to address the housing crisis resulting from the lack of affordable low- and middle-income housing in New York City, and more specifically, the problems created by building owners withdrawing from city, state and federal programs for assisted rental housing.[1] The primary purpose of Local Law 79 is to enable a tenant association to exercise a right of first refusal to purchase the building where an owner intends to sell *532 the building or take other action which will result in the owner withdrawing from an assisted rental housing program. Pursuant to the law, the owner must give 12 months’ notice to the tenant association or tenants (collectively, tenants) and HPD of the intention to withdraw from an assisted housing program, and must also give notice of a bona fide offer to purchase the building. (Administrative Code § 26-802.) The tenants then have 60 days in which to notify the owner and HPD of their intention to exercise their right of first refusal. (Administrative Code § 26-805.) HPD must then convene an advisory panel to determine the “appraised value” of the housing. (Administrative Code § 26-804.) The tenants then have 120 days from notice of that determination to submit a bona fide offer to purchase the building. (Administrative Code § 26-806.) In addition, if the tenants do not purchase the housing and it is removed from the assisted rental housing program, the owner or purchaser must allow the current tenants to remain in the apartments for six months from the date of the conversion or until the tenants’ leases expire, whichever is longer, at the same terms and conditions as before the housing was withdrawn from the assisted rental housing program. (Administrative Code § 26-810.)
According to testimony presented at the City Council hearings regarding Local Law 79, two thirds of New Yorkers live in rental apartments, with 25.5% of those New Yorkers paying more than 50% of their income for rent. (Transcript of minutes, Council of City of NY Comm on Hous & Bldgs, Oct. 28, 2004, at 158.) According to a 2002 vacancy survey, there was a 2.94% overall vacancy rate, but a vacancy rate of only 2% for apartments renting for $700 or less. (Id.) Statistics in August 2004 showed that 36,400 homeless men, women and children were sleeping in shelters and thousands more slept on park benches, *533 streets, and in subways. (Id. at 159.) Also, according to testimony presented at the hearings, 44,000 units of housing have already been lost from Mitchell-Lama and federal section 8 assisted financing programs (see 42 USC § 1437f), with a projected loss of 110,000 units over the next few years, if no action is taken to stem the flow of units from assisted financing programs. (Transcript of minutes, Council of City of NY Comm on Hous & Bldgs, Oct. 28, 2004, at 12.)
Shaun Donovan, Commissioner of HPD, also testified before the City Council concerning the Mayor’s plan to create and preserve 65,000 units of affordable housing, efforts to establish funds to preserve an additional 4,500 units of affordable housing, and various efforts at pursuing state legislation to convince owners to remain in the Mitchell-Lama program. (Transcript of minutes, Council of City of NY Comm on Hous & Bldgs, May 9, 2005, at 13.) Donovan testified that HPD had closed 15 refinancings, which will keep 6,205 units affordable for another 15 years, and hoped that another 15 developments would refinance, maintaining another 7,397 units as affordable housing. (Id. at 16.) However, even assuming that the Mayor is able to accomplish his plans for new and preserved units of affordable housing, the testimony before the City Council indicates that, if governmental action is not taken with respect to Mitchell-Lama conversions, the City is still likely to lose tens of thousands of units of affordable housing over the next few years.
Despite these statistics, the validity of which the Real Estate Board does not contest, plaintiff characterizes Local Law 79 as merely an effort by then-City Council Speaker, Gifford Miller, who was running for Mayor at the time, to cater to hundreds of thousands of voters living in housing projects. Such a characterization flies in the face of the testimony presented before the City Council, and the well-known problem in this city of continuing escalating rents and decrease in the number of affordable housing units.
The Mitchell-Lama Program
The Mitchell-Lama program was designed to encourage private financing of low- and middle-income housing where affordable housing was not otherwise provided by the private real estate market, by the creation of limited-profit housing companies. In return for offering private developers long-term, low-interest government mortgage loans and real estate tax abatements, the developer had to agree to limited rents and profits and to regulation of tenant selection and the transfer of *534 property. (Private Housing Finance Law §§ 20-23, 28, 31, 36.) Rents in Mitchell-Lama housing, which are established on a project-by-project basis, and are subject to governmental approval, are calculated so as to cover operating costs, maintenance and debt service of the particular project.
Under the law as originally enacted, an owner that obtained a loan prior to May 1, 1959 could be voluntarily dissolved with the consent of the supervising agency not less than 35 years after the occupancy date, on the payment of the remaining balance of both principal and interest. (Private Housing Finance Law § 35 [1].) Because of the difficulty of encouraging private developers to enter the program, the “buy out” provision was amended, and owners of buildings that obtained loans after May 1, 1959 were entitled to leave the program 20 years after the building’s “occupancy date,” without the permission of the agency, provided that they paid the balance of the mortgage and all other expenses incurred in the dissolution. (Private Housing Finance Law § 35 [2]; see Davis v Waterside Hous. Co., NYLJ, Oct. 1, 1999, at 27, col 4, revd on other grounds 274 AD2d 318 [1st Dept 2000].)
Shortly after the Legislature decided to make it easier for building owners to withdraw from the Mitchell-Lama program in order to encourage the involvement of private capital, it quickly realized that permitting the many units coming out of the program to revert to market rents would be disastrous. Therefore, buildings withdrawing from the Mitchell-Lama program, which were occupied prior to 1974, were made subject to rent stabilization programs, governed by the Rent Stabilization Law of 1969 (RSL) (Administrative Code § 26-501 et seq.), or the Emergency Tenant Protection Act (ETPA) (L 1974, ch 576, § 4), rather than being permitted to enter the free market. (See e.g. Matter of KSLM-Columbus Apts., Inc. v New York State Div. of Hous. & Community Renewal, 5 NY3d 303 [2005].) The Mitchell-Lama program, therefore, coexists with what has been described as “ ‘the legislative quagmire which encompasses the New York City and New York State rent control laws.’ ” (Id. at 309, quoting Matter of KSLM-Columbus Apts., v New York State Div. of Hous. & Community Renewal, 6 AD3d 28, 30 [1st Dept 2004].) Except in limited circumstances, housing units occupied after 1974 may, however, revert to the free market, and it is the tenants of these units that the City Council has sought to protect. (See e.g. Matter of Tivoli Stock LLC v New York City Dept., of Hous. Preserv. & Dev., 14 Misc 3d 1207[A], 2006 NY *535 Slip Op 52439[U] [Sup Ct, NY County 2006] [restrictive covenant in deed from New York City requiring building owner to provide affordable housing for longer than the 20-year term set in the Mitchell-Lama Law precludes building owner from buying out of Mitchell-Lama program without consent of HPD].) State Preemption
State preemption generally occurs in one of two ways:
“[F]irst, when a local government adopts a law that directly conflicts with a State statute and second, when a local government legislates in a field for which the State Legislature has assumed full regulatory responsibility. The State Legislature may expressly articulate its intent to occupy a field, but it need not. It may also do so by implication.
“An implied intent to preempt may be found in a ‘declaration of State policy by the State Legislature ... or from the fact that the Legislature has enacted a comprehensive and detailed regulatory scheme in a particular area.’ In that event, a local government is ‘precluded from legislating on the same subject matter unless it has received “clear and explicit” authority to the contrary.’ More specifically,’a local law regulating the same subject matter is deemed inconsistent with the State’s overriding interests because it either (1) prohibits conduct which the State law, although perhaps not expressly speaking to, considers acceptable or at least does not proscribe ... or (2) imposes additional restrictions on rights granted by State law’.” (DJL Rest. Corp. v City of New York, 96 NY2d 91, 95 [2001] [citations omitted].)
The Mitchell-Lama Law
The Real Estate Board contends that, to the extent that Local Law 79 prevents an owner from freely withdrawing from the Mitchell-Lama program after 20 years and “going private,” it is preempted by the Mitchell-Lama Law, both expressly and impliedly.
The Real Estate Board cites the decision in 2550 Olinville Ave. v Crotty (149 Misc 2d 806 [Sup Ct, NY County 1991], affd 185 AD2d 200 [1st Dept 1992]), in which the court ruled that HPD could not reject prepayment of a Mitchell-Lama low-interest mortgage in order to give itself an opportunity to develop regulations governing such prepayment. In so ruling, the court noted that no such regulations had been developed by *536 the agency during the 27-year period between the enactment of the statute and the plaintiffs’ attempt to leave the Mitchell-Lama program. However, in that decision there was no direct discussion of preemption, since there was no city law in place giving the City the authority to withhold approval of prepayment.
The Real Estate Board cites no provision in the Private Housing Finance Law that expressly prohibits the City from enacting laws regarding Mitchell-Lama housing. Nor has the state law totally excluded municipalities from involvement in the Mitchell-Lama program. Rather, the Private Housing Finance Law expressly includes municipalities in many aspects of the housing program. Not only can municipalities make low-interest loans to limited-profit companies or public benefit corporations, they may promulgate rules and regulations with respect to municipally-aided projects; oversee the fixing of maximum rent to be charged, as well as charges for nonhousekeeping accommodations, aged care accommodations, including the downward adjustment of surcharges where necessary; and have substantial supervisory authority over these limited-profit companies. (See e.g. Private Housing Finance Law §§ 23, 31, 32.) Thus, it cannot be said that the State intended to completely occupy the area of limited-financing housing corporations.
However, the question of whether there is a conflict between the Mitchell-Lama Law and Local Law 79 is more troublesome. In amending Private Housing Finance Law § 35 to permit owners to withdraw from the program after only 20 years, rather than 35, and to eliminate the requirement of permission from the commissioner, the Legislature was acting to remove impediments to withdrawal from the program. In contrast, Local Law 79 “ ‘imposes additional restrictions on rights granted by State law.’ ” (See DJL Rest. Corp. v City of New York, 96 NY2d at 95.)
Given the fact that Mitchell-Lama buildings which were occupied before 1974 have been made subject to rent stabilization, this court does not believe that the owners of Mitchell-Lama buildings are entitled to a completely “unfettered right to voluntarily dissolve and sell or rent their property at market value,” as discussed by the Supreme Court in 2550 Olinville Ave. v Crotty (149 Misc 2d at 812 [emphasis omitted]), as the Real Estate Board contends. Nonetheless, the question remains as to whether New York City may impose restrictions on building owners, such as those found in Local Law 79.
In this “quagmire” of laws governing housing in New York, despite the critical importance of maintaining available housing *537 to low- and moderate-income New York City residents, the State Legislature has given the City only limited authority to legislate and regulate in the area. Although the economic and social conditions of this City are far different from those in other parts of the state, except where the Legislature has granted express authority to the City, as under the ETPA, the power to make crucial policy decisions regarding affordable housing has been reserved to the State. So, for example, it is the State Legislature, not the City Council, that determines what constitutes “luxury” housing accommodations in New York City and what income level will trigger “luxury decontrol” of that housing, eliminating the protections of the RSL (see Rent Regulation Reform Act of 1993 [L 1993, ch 253], amending RSL [Administrative Code] tit 26, ch 4), regardless of the fact that the cost and availability of housing in New York City may have little if any impact on the lives of legislators and their constituents in other parts of the state.
Whether it be by creating a right of first refusal or by extending rent stabilization, the State Legislature may well have the ability to protect low- and middle-income residents of Mitchell-Lama buildings, as it has done in the past. In failing to do so, or to permit the City of New York to do so, the State Legislature has failed the residents of the City of New York. The recent sales and proposed sales of major assisted rental housing complexes in this city and the likely devastating impact of those sales on low- and moderate-income residents of New York may and should function as a wake-up call for the need for immediate action by the State. However, this court reluctantly concludes that the State Legislature having granted owners of Mitchell-Lama buildings the right to withdraw from the program, the City may not impose additional restrictions that would burden that right. Provisions of Local Law 79 which would mandate a right of first refusal to tenants of a building withdrawing from Mitchell-Lama are inconsistent with, and therefore, preempted by the Mitchell-Lama Law.
The Urstadt Law
Under the Urstadt Law (L 1971, ch 372), municipalities are barred from enacting local laws or ordinances to provide for:
“the regulation and control of residential rents and eviction in respect of any housing accommodations which are (1) presently exempt from such regulation and control or (2) hereafter decontrolled either by operation of law or by a city housing rent agency, *538 by order or otherwise. No housing accommodations presently subject to regulation and control pursuant to local laws or ordinances adopted or amended under authority of this subdivision shall hereafter be by local law or ordinance or by rule or regulation which has not been theretofore approved by the state commissioner of housing and community renewal subjected to more stringent or restrictive provisions of regulation and control than those presently in effect.” (McKinney’s Uncons Laws of NY § 8605 [Local Emergency Housing Rent Control Act § 5; L 1962, ch 21, as amended].)
The Real Estate Board contends that Local Law 79 is inconsistent with the Urstadt Law in two ways — first, by requiring that tenants who purchase Mitchell-Lama buildings keep rents artificially low, and second, by requiring that where Mitchell-Lama buildings are not purchased by tenants, and leave the program, tenants be permitted to remain in their apartments at the existing rent, for six months or the remainder of the lease term, whichever is greater.
The court agrees with the City Council, that where the tenant association exercises its right of first refusal and purchases the building or buildings, it is doing so based upon an agreement to maintain lower-than-market-rents, just as any private landowner could, but is unlikely to do. That decision by a tenant association is voluntary and not in violation of the Urstadt Law.
However, to the extent that Local Law 79 requires that a tenant’s current rent would be maintained for a limited period of time after the building withdraws from Mitchell-Lama, that provision is in direct conflict with the express language of the Urstadt Law and is preempted.
Federal Preemption
Even if a state or local law has the same ultimate goal as a federal law, it may run afoul of “conflict preemption” if it “stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” (International Paper Co. v Ouellette, 479 US 481, 492 [1987]; see also Gade v National Solid Wastes Management Assn., 505 US 88, 103 [1992].)[2] The Real Estate Board contends that, to the extent that Local Law 79 applies to owners that seek to withdraw from *539 federal assisted housing programs, it is preempted by federal housing law because it “interferes with the methods by which the federal statute was designed to reach [its] goal.” (International Paper Co. v Ouellette, 479 US at 494.)
The federal scheme governing assisted rental housing, which is described in detail in Forest Park II v Hadley (336 F3d 724 [8th Cir 2003]), is certainly as complex as the New York State scheme. Like the state, in the 1960s Congress established several programs to encourage private developers to build affordable housing for low-income citizens, offering those developers below-market interest rates. Under those programs, developers had the right to prepay federal mortgages and exit the programs after 20 years, without the prior consent of the federal Department of Housing and Urban Development (HUD). In the 1980s, Congress became concerned that there would be a “flood of repayments” that would increase the shortage of available housing, so additional legislation was passed authorizing HUD to offer more incentives to discourage prepayment, but set additional stringent conditions for prepayment. (Id. at 728.) In 1990, Congress again changed the law, giving additional incentives to remain in the assisted housing programs, but requiring that owners of federally assisted housing had to notify the federal and local governments as well as the tenants of the intention to prepay federal mortgages. That 1990 law contained express preemption provisions, prohibiting states from restricting or inhibiting prepayment. In the late 1990s, however, because of the expense of the incentive programs, Congress cut back on the funding of the earlier programs and passed yet another law, the Housing Opportunity Program Extension Act of 1996 (HOPE) (Pub L 104-120, 110 US Stat 834), which provided for prepayment of federal mortgages, notwithstanding the requirements of the earlier law. HOPE also removed the express preemption provisions enacted in 1990. (See discussion of federal legislation, Forest Park II v Hadley, 336 F3d at 728-730.)
The Real Estate Board relies on Forest Park II v Hadley in support of its argument that Local Law 79 is preempted by federal law. There, the United States Court of Appeals for the Eighth Circuit held that in light of the history of federal as *540 sisted housing legislation, a Minnesota law requiring additional forms of notice by owners wishing to withdraw from specific federal subsidized housing programs was preempted. The court noted that the State of Minnesota could not prevent HUD from accepting prepayment of federal loans and releasing owners from the requirements of the federal programs; however, the court held that the additional notice requirements placed by the state on federal program participants impeded and burdened the prepayment of federal mortgages. The court concluded that even though the federal and state statutes shared the general objective of creating subsidies for low-income housing, the state statute procedures interfered with the framework created by Congress and were, therefore, preempted.
The City Council relies on Kenneth Arms Tenant Assn. v Martinez (2001 US Dist LEXIS 11470 [ED Cal, July 3, 2001]), holding that a California law which mandated additional notice requirements for owners withdrawing from federal housing programs was not preempted by federal housing laws. According to the court, the goal of both the California and federal laws was to insure the availability of low-cost housing, and the fact that the state notice provisions imposed greater procedural restrictions than those imposed by the federal law did not mean that those laws constituted an obstacle to the purposes and objectives of Congress.
The subsequent ruling of a United States Court of Appeals for the Eighth Circuit, however, carries greater weight than the prior federal district court decision. Even assuming that were not the case, the provisions of Local Law 79 requiring a right of first refusal for tenants constitutes a far greater obstacle to withdrawing from federal programs than do the additional notice requirements of the California and Minnesota statutes.
According to the City Council, the court in Kenneth Arms also rejected claims of federal preemption regarding right of first refusal provisions in the California statute. However, the California court discussed the issue of preemption solely in relation to the notice requirements in the statute. It is not clear from the court’s opinion whether preemption arguments were even made regarding the right of first refusal provisions of the statute. Rather, at issue was whether an offer to purchase made to the property owner was from a “qualified buyer,” as defined by the California statute.
*541 The City Council also cites a series of cases where, it asserts, the highest courts of New Jersey, Connecticut and Massachusetts “mandated” building owners to participate in “voluntary” federal housing subsidy programs. (See Franklin Tower One, L.L.C. v N.M., 157 NJ 602, 725 A2d 1104 [1999]; Commission on Human Rights & Opportunities v Sullivan Assoc., 250 Conn 763, 739 A2d 238 [1999]; Attorney Gen. v Brown, 400 Mass 826, 511 NE2d 1103 [198,7].) In those cases, however, at issue was whether an owner could discriminate against a tenant merely because the tenant qualified for federal section 8 housing assistance, not whether an owner would have to comply with additional state law requirements to withdraw from a federal program.
Finally, the City Council contends that the history of federal housing legislation indicates a shift away from preemption. The City Council points to the fact that the Low-Income Housing Preservation and Resident Homeownership Act of 1990 (LIHPRHA) (12 USC § 4101 et seq.) contained an express preemption provision, barring states and localities from restricting mortgage prepayments. (See 12 USC § 4122 [a].) In contrast, HOPE (Pub L 104-120, 110 US Stat 834), which removed federal restrictions on mortgage prepayments previously contained in LIHPRHA, also eliminated the express preemption provision. The City Council argues that this change in the law indicates that Congress no longer had a reason to preempt state and local housing regulation. Without some express indication in the legislative history, this court is loath to draw such a conclusion regarding the intent of Congress, where, in enacting HOPE, Congress made it easier for owners to prepay their federal mortgages and leave federal assisted housing programs.
On balance, this court, again, reluctantly concludes that to the extent that it applies to federal housing programs, Local Law 79 is preempted by federal housing law.
Because the court has concluded that Local Law 79 is preempted by state and federal law, it is not necessary to reach the Real Estate Board’s other arguments.
Accordingly, it is hereby ordered that the motion for summary judgment of plaintiff Real Estate Board of New York, Inc. is granted; and it is further adjudged and declared that Local Law 79 (adding Administrative Code of City of NY § 26-801 et seq.) is declared void as preempted by state and federal law; and it is further ordered that plaintiffs motion for a permanent injunc *542 tion is granted, and defendants City Council of the City of New York, City of New York and New York City Department of Housing Preservation and Development are hereby enjoined from enforcing Local Law 79; and it is further ordered that the cross motion of defendant City Council of the City of New York is denied.

. Assisted rental housing programs covered by the law include:
*532 “(1) any program created, administered, or supervised by the city or state under article II or article IV of the private housing finance law [Mitchell-Lama housing], but shall not include any multiple dwelling owned or operated by a company organized under article II or article IV of the private housing finance law that was occupied prior to January 1, 1974.
“(2) any program providing project-based assistance under section eight of the United States housing act of 1937, as it may be amended from time to time; and
“(3) housing programs governed by sections 202, 207, 221, 232, 236, or 811 of the national housing act (12 U.S.C. 1701 et seq.), as they may be amended from time to time.” (Administrative Code § 26-801 [c].)

. A federal law may also preempt a state or local law where it explicitly bars state or local legislation (express preemption) or where the federal govern *539 ment has occupied the field (implied preemption). (See Hillsborough County v Automated Medical Laboratories, Inc., 471 US 707, 713 [1985].) The Real Estate Board is not claiming either of these forms of preemption here.