*219 OPINION OF THE COURT
Chief Judge Kaye.
The formula for the maximum base rent (MBR) for rent-controlled New York City apartments ensures landlords an 8.5% return on capital value, defined as equalized assessed valuation under the Real Property Tax Law. That State statute provides two possibly applicable measures of equalized assessed valuation, article 12-A — which was formerly used — and article 12, which the City has now adopted for use in its MBR formula. This diminishes the MBR for some landlords, who challenge the change. The issue in this appeal is whether the City’s adoption of article 12 to measure capital value violates a statute — the Urstadt Law — prohibiting “more stringent or restrictive” rent regulation or control. We conclude that it does not.
I.
Recognizing the backdrop of political, social and economic tensions, Chief Judge Breitel in Matter of 89 Christopher v Joy (35 NY2d 213, 220 [1974]) described the patchwork of rent-control legislation as “an impenetrable thicket, confusing not only to laymen but to lawyers.” The present controversy arises from a patchwork of rent control and real property tax legislation, thus compounding the density.
We begin our journey through the thicket with the City and State rent control laws.
Rent control originated in New York through federal legislation designed to address housing shortages during and immediately after the Second World War (see generally, Teeval Co. v Stern, 301 NY 346 [1950]; Daniel Finkelstein and Lucas A. Ferrara, Landlord and Tenant Practice in New York 11:2 [1997]). Pursuant to the Emergency Housing Rent Control Law, the State administered rent control beginning in 1947, including in New York City from 1950 through 1962 (see, L 1946, ch 274, and L 1950, ch 250, as amended [McKinney’s Uncons Laws of NY § 8581 et seq.]). Then, under the Local Emergency Housing Rent Control Act (LEHRCA), the City acquired the power to perform this administrative function for residences within the City, and to enact local laws setting and adjusting *220 maximum rents (L 1962, ch 21 [McKinney’s Uncons Laws of NY § 8601 et seq.Y). The City promptly took up its mandate (see, Local Laws, 1962, No. 20 of City of New York). In 1983, rent regulation administration was returned to the State, specifically to defendant Division of Housing and Community Renewal (DHCR). The City’s local laws and rules concerning rent control were otherwise left largely intact (see, L 1983, ch 403, §§ 3, 28).
State Formula for Rent Adjustments
From the beginning, State rent control legislation provided not only for establishing maximum rents but also for adjusting them where the maximum rent was substantially different from the federal statutory rent or the prevailing rent in comparable rent-controlled property, or imposed hardship (see, L 1946, ch 274, § 4). In 1951, the Legislature refined the adjustment provisions to provide for “individual adjustment of maximum rents where * * * the rental income from a property yields a net annual return of less than four per centum of the valuation of the property” (L 1951, ch 443, sec 1, § 4). The return on capital has since risen to 7.5% (see, L 1971, ch 371, § 2 [Uncons Laws § 8584 (4) (a)]). Thus, the Legislature permitted adjustments to ensure landlords a stated return on capital. The measure of capital value was the “current assessed valuation” established locally, “properly adjusted by applying thereto the ratio which such assessed valuation bears to the full valuation as determined by the state board of equalization and assessment” (L 1951, ch 443, sec 1, § 4 [Uncons Laws § 8584 (4) (a)]).
In this way, the State rent control laws early recognized that local governments for over 200 years have generally assessed real estate, for tax purposes, at something less than full value (see generally, Matter of Hellerstein v Assessor of Town of Islip, 37 NY2d 1, 13 [1975]). As the quoted statutory language also reflects, the State has historically calculated the equalization rate — the ratio between assessed value and market value for every local assessing unit. Although “equalization at most represents an average” rather than a measure tailored to each individual building (Matter of Hartley Holding Corp. v Gabel, 13 NY2d 306, 310 [1963]), in some cases equalization rates have been available for different kinds of property within a locality. Indeed, early statewide rent control legislation provided for the use of such ratios in adjusting maximum rents: “where at the time of the filing of the application for an adjust *221 ment under this subparagraph such board has computations for [such year] indicating a different ratio for subclasses of residential property in a city, town or village, the commission shall give due consideration to such different ratio * * *” (L 1957, ch 755, sec 1, § 4 [Uncons Laws § 8584 (4) (a)]).
City Formula for Rent Adjustments
The City’s earliest formula for adjusting maximum rents used the “current assessed valuation” of the property to determine its value, and hence the adequacy of the net annual return received by a given landlord (Local Laws, 1962, No. 20 of City of New York). While this formula failed to account for the difference between assessed and market value, we upheld the City formula despite its divergence from the State formula (see, I.L.F.Y. Co. v City Rent & Rehabilitation Admin., 11 NY2d 480, 490 [1962]). In 1970 the City passed Local Law 30, enacting a new maximum rent formula (Administrative Code of City of NY § Y51-5.0 [a], now § 26-405 [a]). Like the earlier State legislation, Local Law 30 provided both for the calculation of maximum rents and for adjustments to these rents, and for the first time it, too, provided for equalization.
More specifically, the City’s formula provided — and still provides — that the maximum rents for individual apartments be determined “by dividing the maximum gross building rental” from all apartments in a building by the number of apartments, with adjustments to reflect such factors as apartment size (Administrative Code § 26-405 [a] [3]). The maximum gross building rental, in turn, consists of several fixed costs, plus a fixed return on capital:
“Such maximum gross building rental shall be computed on the basis of real estate taxes, water rates and sewer charges and an operation and maintenance expense allowance, a vacancy allowance not in excess of two per cent, and a collection loss allowance, both as prescribed by such agency, and an eight and one-half per centum return on capital value” (Administrative Code § 26-405 [a] [3]).
As enacted, this section added that capital value “shall be equalized assessed valuation as established pur[su] ant to article twelve-A of the Real Property Tax Law” (Local Laws, 1970, No. 30 of City of New York § 11). Local Law 30 also provided that maximum rents should be adjusted biennially; *222 that “the return allowed on capital may be revised from time to time by local law” (Administrative Code § 26-405 [a] [4]); and that where the maximum rent established using the new formula exceeds the existing maximum, the permissible annual rent increase to close this gap may not exceed 7.5% (Administrative Code § 26-405 [a] [5]).
The Urstadt Law
In 1971, the State Legislature enacted two relevant statutes. The Vacancy Decontrol Law (L 1971, ch 371) exempted newly vacated apartments from rent regulation. More critically for present purposes, the Legislature enacted the Urstadt Law, amending LEHRCA to provide that:
“No housing accommodations presently subject to regulation and control pursuant to local laws or ordinances adopted or amended under authority of this subdivision shall hereafter be by local law or ordinance or by rule or regulation which has not been theretofore approved by the state commissioner of housing and community renewal subjected to more stringent or restrictive provisions of regulation and control than those presently in effect” (L 1971, ch 372, as amended by L 1971, ch 1012 [Uncons Laws § 8605] [emphasis added]).
The present appeal turns on whether this prohibition in the Urstadt Law — which, as all parties agree, limits the City’s ability to amend at least some aspects of Local Law 30 — froze the definition of capital value so that only Real Property Tax Law article 12-A can be used to calculate that value. To understand this issue and the amendment of Local Law 30 that brought it to the fore, we must look more closely at the history of equalization rates.
The Real Property Tax Law
As noted, the State calculates equalization rates because local governments, for their own reasons, assess real property at varying percentages of market value. The equalization rate “ ‘indicates the percentage of full value at which the assessor in a locality is assessing, on the average’, taxable property in his locality” (Bucho Holding Co. v Temporary State Hous. Rent Commn., 11 NY2d 469, 472 n 2 [1962]). The State uses equalization rates to determine the distribution of state aid to localities, the apportionment of taxes of joint school districts, *223 and the limitations on local taxing and borrowing powers. Some equalization scheme has been in force since 1859.
By the 1960s, the State’s equalization scheme was set forth in article 12 of the Real Property Tax Law. Specifically, section 1202 of that statute required the State Board of Equalization and Assessment to “ascertain as near as may be the percentage of full value at which taxable real property in [each] city, town or village is assessed” (L 1958, ch 959, § 1202 [1]). In performing this duty, the State Board did not use current market values to determine the equalization rate. Instead, it used a weighted average of price levels prevalent in previous years. For instance, to set the equalization rates for 1968 assessment rolls, the State used 1963 and 1965 price levels, giving double weight to the 1963 levels (see, Letter from Robert F. Kilmer, Counsel, State Board of Equalization and Assessment, to Michael Whiteman, First Assistant and Acting Counsel to Governor, June 13, 1968, Bill Jacket, L 1968, ch 1069, at 7).
Given evidence that market values had been increasing more rapidly in New York City than elsewhere, this practice was believed to yield a low estimate of New York City real estate values, thus depressing the level of taxing and borrowing the City could conduct within constitutional limits (see, NY Const, art VIII, §§ 4, 10; see also, Bill Jacket, L 1968, ch 1069). To enhance the City’s taxing and borrowing power, in 1968 the State Legislature enacted article 12-A of the Real Property Tax Law (L 1968, ch 1069; Real Property Tax Law § 1250 et seg., esp. § 1254).
Article 12-A provides for the calculation of special equalization ratios for New York City, and since 1978 for other cities with populations in excess of 125,000 (see, Real Property Tax Law § 1251; L 1978, ch 280). The statute directs the State Board to determine these ratios for the current year, using current market surveys completed pursuant to article 12 or— where current surveys have not been completed — extrapolations from the most recent completed surveys (see, Real Property Tax Law § 1252). By mandating the calculation of up-to-date ratios, article 12-A provided the most accurate measure of the City’s constitutional borrowing and taxing limits available in the late 1960s and 1970s. The difference between article 12 and article 12-A ratios was relatively small during those years, partly because both articles provided for the establishment of one ratio applicable to all real property City-wide, regardless of the nature of the property.
*224 This rough congruence between the articles unraveled in more recent years. In 1975, we determined that the practice of assessing real property at less than full value violated Real Property Tax Law § 306, then in force (see, Hellerstein, supra, 37 NY2d, at 14). In response, the Legislature repealed section 306 and enacted further significant changes to the Real Property Tax Law, including amendments to article 12 and the creation of article 18 (see, L 1981, ch 1057). Under the current article 12 — which incorporates by reference article 18 (see, Real Property Tax Law § 1202 [1] [b]) — for equalization purposes, New York City real property falls into four classes: class one, one-, two- and three-family homes; class two, most apartment buildings; class three, utility real property; and class four, all other real property (see, Real Property Tax Law § 1802 [1]). Article 12-A does not provide a similar classification.
Before we move on to consider the impact of this change on the MBR formula, we note that there is no evidence that the State Legislature, in amending the Real Property Tax Law, had in mind the possible effect of its amendments on New York City rent control.
The Road to Local Law 73
The further amendment of the rent control laws, up to the present dispute, stands in relief against this property tax background. After 1981, the City classified real property into four classes coterminous with those newly created in articles 12 and 18, and proceeded to assess class one properties at a much lower percentage of market value than properties in the other classes. Specifically, for fiscal 2000, class one properties were assessed at approximately 8% of market value, while all other properties (including the vast majority of buildings subject to rent control) were assessed at some 45%.
Article 12 equalization rates for class two properties have kept pace with these assessments. Thus, applying these rates to produce market value has recently entailed multiplying the assessed value by around two. (If a building is assessed at a multiple of 0.45 of market value, one must multiply the assessed value by 2.2 to reach market value.) Article 12-A equalization rates, determined without differentiation among types of real property, have in recent years yielded much higher multipliers. Thus, a landlord interested in obtaining the highest MBR would prefer to have the capital value component determined using an article 12-A equalization ratio rather than an article 12 ratio.
*225 In the first few years after the 1983 return of rent control administration to the State, DHCR used the article 12-A ratio, as explicitly required by the predecessor to Administrative Code § 26-405 (a) (3). Beginning with the 1986-1987 MBR cycle, however, DHCR began to use article 12 ratios. A landlords’ group challenged this practice and, in 1997, prevailed before the Appellate Division, which found the DHCR’s practice contrary to the plain language of Administrative Code § 26-405 (a) (3), which specified that capital value was to be equalized assessed valuation as established pursuant to article 12-A (see, Matter of Community Hous. Improvement Program v New York State Div. of Hous. & Community Renewal, 230 AD2d 66, 70 [1997]).
After hearings, DHCR then determined the adjustment factor based on its recalculation of the MBR using article 12-A, and issued orders based on this calculation. Because of the 7.5% cap of Administrative Code § 26-405 (a) (5) — and because the 8.5% return on capital value is only one component of the rent formula — the new calculation would not have had a significant immediate financial impact on any tenant’s rent. It did, however, have a significant immediate political impact. Before the DHCR’s new orders could take effect, the City enacted Local Law No. 73 of 1997, amending Administrative Code § 26-405 (a) (3) to substitute reference to article 12 for article 12-A. The DHCR promptly issued new orders reinstating rents calculated with article 12.
In response, individual landlords and two real estate organizations, intervenors-appellants here, brought a combined proceeding against DHCR for CPLR article 78 and declaratory relief, seeking a judgment that Local Law 73 violates the Urstadt Law and that they are entitled to the MBR increases the DHCR had previously calculated using article 12-A. The City, in turn, brought an action against DHCR, seeking a declaration upholding Local Law 73. When DHCR issued orders establishing MBRs for 1998/1999, the landlords brought another proceeding to challenge those orders. Ultimately all proceedings and actions were consolidated — leaving landlords on one side and the City and tenant groups on the other — and summary judgment motions ensued. Supreme Court denied the landlords’ motion and granted the cross motions of the City and tenants, declaring that Local Law 73 does not violate the Urstadt Law, and ordering DHCR to issue MBR orders for 1996/1997 and 1998/1999 using the measure of capital value set forth in Local Law 73. The Appellate Division modified to *226 delete the direction to DHCR and replace it with a declaration that DHCR’s existing interim maximum base rent orders are deemed final, and otherwise affirmed. We affirm.
II.
The issue thus boils down to one of statutory interpretation: is the promise of the Urstadt Law, immunizing rent-controlled properties from “more stringent or restrictive provisions of regulation and control,” violated by Local Law 73, which substitutes article 12 of the Real Property Tax Law for article 12-A in the calculation of capital value?
The Urstadt Law contains no definition of “more stringent or restrictive provisions of regulation and control” and thus no clear indication of whether a local law is prohibited solely because it tends to reduce profits for rent-controlled property owners. Because the language of the statute does not resolve the issue before us, we turn to its history and context.
As this Court previously explained, the Urstadt Law “was part of a series of bills prompted by the State’s concern over the abandonment and divestment of controlled housing in New York City attributable in large part to uneconomic rents. The objective of the State legislative action was ‘[b]y limiting the fear of more stringent control [to] encourage owners to invest in the maintenance and improvement of existing housing units and thereby help to stem the tide of abandonment of sound buildings in the City5 ” (Mayer v City Rent Agency, 46 NY2d 139, 150 [1978]).
Given that the City had recently introduced rent stabilization, bringing buildings constructed between 1947 and 1969 under regulation, one way in which the Urstadt Law achieved its purpose was by prohibiting further City regulation of buildings “presently exempt” or “hereafter decontrolled” (Uncons Laws § 8605; see also, Local Laws, 1969, No. 16 of City of New York; Administrative Code of City of NY § 26-501 et seq.)- In this way the Urstadt Law prevents the City from expanding rent regulation. A second way the Urstadt Law achieved its purpose was by requiring DHCR approval for more stringent or restrictive City regulations (L 1971, ch 1012 [Uncons Laws § 8605]). By adding the requirement, the Legislature addressed concerns that the City — which at that time was administering rent control — would use its regulatory powers to thwart the process of vacancy decontrol (see, e.g., Memoranda of Charles J. Urstadt, Commissioner, DHCR, to Michael Whiteman, Counsel to Governor, June 29 and July 2, 1971, Bill Jacket, L 1971, ch 1012, at 1-4).
*227 The legislative history suggests, then, that the Urstadt Law was intended to check City attempts, whether by local law or regulation, to expand the set of buildings subject to rent control or stabilization, and particularly to do so in the teeth of State enactments aimed at achieving the opposite effect. And, indeed, much of our jurisprudence under the Urstadt Law has addressed the nature of the State Housing Commissioner’s authority to approve or disapprove City regulations (see, Mayer, supra, 46 NY2d, at 152; Matter of 241 E. 22nd St. Corp. v City Rent Agency, 33 NY2d 134, 139 [1973]). These cases, moreover, confirm that — as the statutory language indicates — the Urstadt Law limits City attempts to enlarge its regulatory control over landlords.
Thus, in Mayer, we struck down a local law that purported to “clarify” Local Law 30 by including among rent increases capped at 7.5% annually certain rent increases, designed to pass increased labor costs along to tenants, that Local Law 30 had excluded from that cap. Adopting Supreme Court’s reasoning, we recognized that the purported clarification of Local Law 30 took away landlords’ ability to pass along a class of costs to tenants without restriction. Noting that “the substance rather than the form of the local law is determinative” of whether it is more stringent or restrictive, we found that the City’s “clarification” was a substantial change prohibited by the Urstadt Law (46 NY2d, at 149). Significantly — and contrary to the landlords’ interpretation here — we did not equate “more stringent or restrictive” with “less profitable to landlords.” The key was the effect of the legislation on City regulatory control rather than simply the bottom line.
Similarly, in 241 E. 22nd St. Corp., we found an Urstadt Law violation because the City regulations under review would have removed a class of apartments from eligibility for rent increases under the “hardship” increase provisions of Local Law 30 (33 NY2d, at 139). Again, the amended regulations enlarged the City’s regulatory control. The same was obviously true of our other Urstadt case, in which we struck down an attempt to repeal the MBR provisions of Local Law 30 (see, 210 E. 68th St. Corp. v City Rent Agency, 76 Misc 2d 425, mod in part and affd 43 AD2d 687, affd 34 NY2d 560 [1974]).
Against this background, we return to the question whether the State Legislature, in prohibiting “more stringent or restrictive” regulation, also locked in Local Law 30’s reference to Real Property Tax Law article 12-A, precluding substitution of a later, more accurate measure of capital value in the Real Property Tax Law. We conclude that it did not.
*228 That conclusion is fortified by other precedents of this Court. After the City began to administer rent control in 1962, LEHRCA and the City’s legislation pursuant to it survived a series of constitutional challenges brought by parties aggrieved by the City and State maximum rent formulas. Specifically, we held that the Federal and State Constitutions did not prohibit the State, which had begun to use 1961 equalization rates to set rents, from reverting to the use of 1954 rates in order to avoid rent increases (Bucho Holding Co., supra, 11 NY2d, at 476-478), and that the City, in determining rent adjustments, was not constitutionally required to use equalized valuations (Matter of Hartley Holding Corp., supra, 13 NY2d, at 309). Finally, we upheld DHCR’s use of a town equalization rate to determine the value of rent-controlled property — even though the DHCR thereby departed from its normal practice, which would have been to use a village assessment and equalization rate applicable to the same property — because the town rate was more accurate (see, Matter of Realty & Indus. Corp. v Gaynor, 24 AD2d 201, 204, affd without opn 17 NY2d 734 [1966]). Of course, none of these decisions involved the Urstadt Law, but they do reveal a skepticism about attempts to assert the right to have rents set on the basis of particular valuation and equalization methods. The drafters of the Urstadt Law were presumptively aware of our decisions.
In this context, we cannot accept the landlords’ argument that the Urstadt Law was intended to give them a vested interest in overvaluation. When Local Law 30 and the Urstadt Law were passed, the Real Property Tax Law contained only one equalization mechanism — article 12-A — addressed specifically to New York City real estate, and it was natural for the City Council to adopt such a measure. We cannot accept, however, that the State Legislature intended to prohibit the City Council from later adopting another, more accurate, equalization scheme — also under the Real Property Tax Law, also tailored specifically to New York City — that had not yet been enacted.
The dissent suggests that a Local Law reducing the return on capital value from 8.5% to 1% would be permissible under our construction of the Urstadt Law (dissenting opn, at 232). Not so. An 8.5% return on capital was integral to Local Law 30, as was the use of equalized assessed valuation under the Real Property Tax Law to determine capital value, rather than, for instance, a City-run survey of recent sales prices of comparable buildings. Our decision today in no sense diminishes the protections of the Urstadt Law against such changes in rent control. It merely recognizes that Local Law 73 preserves that *229 regulatory scheme while restoring the congruence between the statutory measure of capital value and the actual value of rent-controlled buildings that the State Legislature took for granted when it passed the Urstadt Law.
We have long recognized that rent control legislation often “contains serious gaps, not readily filled by interpretation based on intention, because there was none” (Matter of 89 Christopher, supra, 35 NY2d, at 220). We have therefore adopted constructions “not in accord with the literal language” of the legislation, where needful, keeping in mind that an “accurate result” is essential (Matter of Tenants’ Union of W. Side v Beame, 40 NY2d 133, 137, 138 [1976]). Here, accuracy in capital valuation was the goal of Local Law 73 (see, Report of Comm on Hous & Bldgs, approving Local Laws, 1997, No. 73 of City of New York, 1997 NY City Legis Ann 300, 303). The Urstadt Law does not prohibit City legislation aimed at achieving that goal.
Accordingly, the order of the Appellate Division should be affirmed, with costs.