OPINION OF THE COURT
Shlomo S. Hagler, J.
Petitioner London Terrace Associates, L.P (petitioner or owner) moves by notice of petition and amended verified petition, pursuant to article 78 of the Civil Practice Law and Rules, seeking a judgment (1) annulling the order of the Deputy Commissioner issued on February 10, 2011, under docket No. XL-430004-RP (order) (see exhibit A to amended verified petition), (2) reinstating 51 individual orders of the Rent Administrator issued on October 27, 2006, which granted petitioner’s application for a fair return on capital value, commonly referred to as “hardship” rent increase, pursuant to New York City Rent and Rehabilitation Law (Administrative Code of City of NY) § 26-405 (g) (1) (a) (known as the Rent Control Law) and New York City Rent and Eviction Regulations (9 NYCRR) § 2202.8, or in the alternative, (3) remanding the proceeding to the New York State Division of Housing and Community Renewal (DHCR) to recalculate the hardship rent increase utilizing the Real Property Tax Law article 12-A equalization ratio. DHCR and intervenor-respondent Four Corners Tenants Association (Tenants Association) oppose the relief sought in the petition.
Petitioner also moved for an order pursuant to CPLR 408, granting it leave to obtain certain discovery from DHCR representatives and nonparties, New York City Council Speaker Christine C. Quinn, and New York State Assemblyman Richard N. Gottfried. DHCR and the Tenants Association opposed the motion. Both the underlying petition and motion are consolidated herein for disposition.
Parties
The parties herein are the owner, who is the holder of unsold shares allocated to then almost 100 apartments occupied by *479 rent-controlled tenants in several historic buildings located at 405 West 23rd Street, 465 West 23rd Street, 410 West 24th Street and 470 West 24th Street in the heart of West Chelsea in Manhattan (London Terrace Towers or subject buildings), the Tenants Association, a voluntary unincorporated association of tenants residing in London Terrace Towers who are subject to the hardship rent increase sought by the owner, and DHCR, the administrative agency charged with determining the owner’s hardship rent increase application. The subject buildings converted to cooperative ownership in September 1987.
Procedural History
This matter has a tortured history of more than 15 years that has been occasioned by extraordinary delay[1] which is documented in the record and, for the sake of brevity, need not be repeated in detail herein. The saga began in late 1995, when the owner filed an application with DHCR seeking a hardship rent increase for then 93 rent-controlled apartments. The Tenants Association interposed its answer on September 24, 1996, opposing the owner’s application. The Tenants Association alleged that the owner was seeking rent increases on a “massive scale” and the increases would at least double or in some cases triple the tenants’ rent. They further stated that such requested rent increases would be “catastrophic and they would be forced to move.” The Tenants Association predicted dire consequences to its members as follows: “the extent of a dislocation like this in a single development has not been seen since the Great Depression.” While heavily disputed by the parties, for the next 10 years the owner and DHCR battled over the backup information needed to determine the application.
Finally, on October 27, 2006, the DHCR’s Rent Administrator issued orders for the then 51 remaining rent-controlled tenants at London Terrace Towers, granting the owner’s hardship rent increase application effective retroactive to April 26, 1996, which was four months after the application was filed (Rent Administrator’s orders). (See exhibit C to amended verified petition.) *480 The Rent Administrator calculated the equalized assessed value pursuant to RPTL article 12-A and did not count as “income” the maintenance payments that shareholders paid to the cooperative corporation.
In December 2006, the Tenants Association and an individual tenant filed with the DHCR a petition for administrative review (PAR), challenging the Rent Administrator’s orders, under docket No. UK-430074-RT. In its PAR, the Tenants Association alleged that the DHCR should have (1) calculated the equalized assessed value pursuant to RPTL article 12 and not article 12-A, and (2) considered as income maintenance payments that shareholders paid to the cooperative corporation rather than just commercial income, etc. The Tenants Association also sought a stay of the hardship rent increase pending the determination of the PAR. The DHCR issued orders dated March 16, 2007 and May 25, 2007, staying both the retroactive and prospective hardship rent increases because they would impose a financial burden on the tenants. (See exhibits H, K to amended verified petition.)
The owner next describes certain conduct on the part of elected officials, New York City Council Speaker Christine C. Quinn, Congressman Jerrold Nadler, Manhattan Borough President Scott M. Stringer, State Senator Thomas Duane and New York State Assemblyman Richard N. Gottfried, who advocated for lower-income, elderly and long-term tenants who have been in their rent-controlled homes for more than three decades. (See letters dated Apr. 2 and 11, 2007, as exhibits I, J to amended verified petition.) The owner describes the above conduct as “lobbying” or “influencing” the DHCR to reconsider the Rent Administrator’s orders along the lines set forth by the Tenants Association.
On July 23, 2008, the owner commenced a mandamus proceeding against the DHCR under index No. 110112/08, seeking an order compelling the DHCR to determine the PAR within 30 days. The owner and DHCR entered into a stipulation dated September 9, 2008, whereby the DHCR agreed to issue an order determining the PAR within 60 days thereof. (See exhibit L to amended verified petition.) Within the allotted time, on November 7, 2008, the DHCR issued an order granting the Tenants Association’s PAR. (See exhibit M to amended verified petition.) The DHCR rejected the Rent Administrator’s orders because the Rent Administrator failed to consider as income the maintenance payments that shareholders paid to the coopera *481 tive corporation instead of the actual rent paid by the individual rent-controlled tenants as per the Appellate Division’s pronouncement in Matter of Hertz Co. R.E. v New York State Div. of Hous. & Community Renewal (295 AD2d 179 [1st Dept 2002], lv denied 98 NY2d 613 [2002] [Hertz]). However, the DHCR acknowledged that it never asked the owner to provide the amount of maintenance income that the cooperative corporation received in 1994 to process the hardship application with this new methodology. Yet, the DHCR never remanded the matter back to the Rent Administrator to obtain the necessary information. Instead, the DHCR rejected the owner’s application outright with the right to file a “new” application with the supporting evidence.
Thereafter, the owner commenced its first article 78 proceeding under index No. 117327/2008, to challenge the DHCR’s November 7, 2008 order. The DHCR cross-moved to remit the matter back to itself. The Tenants Association opposed the remittance and argued that the DHCR should recalculate the equalized assessed value utilizing RPTL article 12 instead of 12-A. On October 23, 2009, the Honorable Richard E Braun, J.S.C. issued an order effectively granting the motion and cross motion remanding the owner’s hardship application back to the DHCR to consider the Hertz methodology and RPTL article 12. On December 11, 2009, the DHCR issued a “Notice of ReOpening” seeking the parties’ respective positions as to “whether the equalization ratio under Article 12 or Article 12A of the Real Property Tax Law should be used to calculate the hardship rent increase.” (See exhibit Q to amended verified petition.)
The owner then commenced a second mandamus proceeding against the DHCR under index No. 114822/10, compelling the DHCR to issue an order within 30 days. The parties entered into a stipulation whereby the DHCR would issue an order on or before February 14, 2011. On December 21, 2010, the same elected officials, New York City Council Speaker Christine C. Quinn, Congressman Jerrold Nadler, Manhattan Borough President Scott M. Stringer, State Senator Thomas Duane and New York State Assemblyman Richard N. Gottfried, wrote again to the DHCR complaining about the delay in processing the remanded application and reiterating their long-standing position that “[i]n a city with such a shortage of affordable housing we cannot allow unwarranted hardship rent increases to further to deplete our rental housing stock.” (See exhibit R to *482 amended verified petition.) Unlike the prior letters, this letter was neither sent to the owner nor its counsel. The DHCR did not send a copy of this letter to the owner as it had done in the past, because the DHCR “considered the record closed as DHCR had finished processing the case and was drafting its determination” to comply with the February 14th deadline. (See affirmation of Sandra A. Joseph, dated May 19, 2011, in opposition to motion for discovery, ¶ 16.)
Finally, on February 10, 2011, the DHCR issued its final order granting the Tenants Association’s PAR and denying the owner’s remanded hardship rent increase application because it now utilized the Hertz methodology in computing income and, more importantly, adopted a new standard in calculating the equalized assessed value pursuant to RPTL article 12 and not article 12-A. The owner brought this second article 78 proceeding to challenge this final order.
Standard for Article 78 Proceedings
The standard to review an administrative determination that was not made as a result of a formal hearing, such as the challenged order, is set forth in CPLR 7803. The scope is limited to “whether a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion, including abuse of discretion as to the measure or mode of penalty or discipline imposed.” (CPLR 7803 [3] [emphasis added].) A court may not disturb an administrative determination unless there is no rational basis for it in the record or the action is arbitrary or capricious. (Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222 [1974].) The arbitrary and capricious test relates to whether the administrative action should have been taken or is justified; or conversely, the action is without sound basis in reason and is generally taken without regard to the facts. (Id. at 231.)
The Rent Control Laws
As famously stated by several of our Chief Judges, the rent control laws have been described as an “impenetrable thicket” of legislation that still confounds the neophyte to the most learned and proficient. (Matter of 89 Christopher v Joy, 35 NY2d 213, 220 [1974, Breitel, Ch. J.]; City of New York v New York State Div. of Hous. & Community Renewal, 97 NY2d 216 [2001, Kaye, Ch. J.].)
*483 History
The initial rent control laws were designed to address housing shortages in the late 1940s. At the outset in 1946, New York State administered rent control laws in the City of New York through the Emergency Housing Rent Control Law (as added by L 1946, ch 274). The New York State Legislature established a system to generally regulate the maximum rent of rent-controlled tenants and for the owner to obtain a hardship rent increase under certain specific circumstances. (L 1951, ch 443; L 1971, ch 371.) In 1962, under the Local Emergency Housing Rent Control Act (as added by L 1962, ch 21, § 1) the State delegated general authority to the City of New York to enact laws setting and adjusting the maximum rents. The City of New York promptly enacted its own rent control laws for all housing completed or converted for residential use on or before February 1, 1947. (See Local Law No. 20 [1962] of City of NY; Administrative Code §§ 26-401 et seq. [current NY City Rent and Rehabilitation Law].) Under the Omnibus Housing Act of 1983, the Legislature transferred responsibility for administering rent regulation in New York City back to the State in the guise of the DHCR. However, the rent control laws promulgated by the City of New York were left largely intact. (L 1983, ch 403, §§ 3, 28.)
Maximum Base Rent
Under the statutory rent control scheme, the DHCR regulates the maximum base rent (MBR) that a landlord may collect by utilizing a specified formula which takes into account, among other things, real estate taxes, water and sewer charges, operating and maintenance charges and return on capital value. (Administrative Code § 26-405 [a] [3]; 9 NYCRR 2201.4.) Capital value is defined as the “equalized assessed valuation based upon the appropriate tax class ratio which is established pursuant to article twelve of the real property tax law.”[2] (Id. [emphasis added].) Built into the MBR formula, the owner is permitted to obtain an “eight and one-half per centum return on capital value” or investment. (Id.) Regardless of the above MBR calculation, there is a cap or ceiling of 7.5% that the owner may *484 increase rents for any single year. (Administrative Code § 26-405 [a] [5].) The DHCR may adjust the MBR every two years to reflect changes in operating expenses. (9 NYCRR 2201.5 [b].) Fair Return on Capital Value (“Hardship”)
Notwithstanding the general MBR statutory scheme, an owner may also seek a fair return on capital value or hardship rent increase where the net annual return from the property is less than “eight and one-half per centum of capital value.” (Local Law No. 30 [1970] § 12; Administrative Code § 26-405 [g] [1] [a].) As with the MBR counterpart, capital value is also defined as the “equalized assessed value,” but the Legislature omitted any reference to a particular tax class ratio (i.e., RPTL art 12-A or art 12). (Administrative Code § 26-405 [g] [1] [a] [1].) The Legislature’s overriding concern, however, was crystal clear that
“such regulations [hardship applications among others] shall be designed to maintain a system of rent controls at levels which, in the judgment of such agency [DHCR], are generally fair and equitable and which will provide for an orderly transition from and termination of emergency controls without undue dislocations, inflationary price rises or disruption.” (Administrative Code § 26-405 [g] [1] [emphasis added].)
The DHCR filled in the gap by providing RPTL article 12-A as the equalized assessed value multiplier, seemingly as it was the same for MBRs when it was originally enacted in 1970. (See n 2; 9 NYCRR 2202.8 [a] [4].)
In 2002, the Appellate Division held that the DHCR had a rational basis to consider as income the maintenance payments that shareholders paid to the cooperative corporation instead of the actual rent paid by the individual rent-controlled tenants in determining an owner’s hardship rent increase application. (Matter of Hertz Co. R.E. v New York State Div. of Hous. & Community Renewal, 295 AD2d 179 [2002].)
RPTL Article 12 and RPTL Article 12-A In the landmark decision of City of New York v New York State Div. of Hous. & Community Renewal (97 NY2d 216 [2001] [City of N.Y. v DHCR]), the Court of Appeals provided an extensive history of the Real Property Tax Law concerning the City’s interest in estimating real estate values for taxing purposes. Local municipalities had generally assessed the real estate tax values at less than full value. (Matter of Hellerstein v *485 Assessor of Town of Islip, 37 NY2d 1 [1975].) The equalization rate is the ratio between the lower assessed real estate valuation to the full market valuation. This rate “indicates the percentage of full value at which the assessor in a locality is assessing, on the average, taxable property in [its] locality.” (Bucho Holding Co. v Temporary State Hous. Rent Commn., 11 NY2d 469, 472 n 2 [1962] [internal quotation marks omitted].)
The State enacted two equalization schemes. The first was RPTL article 12 wherein the State Board of Equalization and Assessment was charged to determine a percentage of near full value of taxable real property (the equalization ratio) in each locality. The Board did not use market values, but weighted averages in prior years. Since the value of real estate in New York City was increasing more rapidly than in other localities, this equalization scheme limited the City’s level of taxing and borrowing. Therefore, to remedy this problem, the State enacted the second equalization scheme, RPTL article 12-A, by mandating the Board to determine the equalization ratio for the current year using current market surveys. (City of N.Y. v DHCR at 224; RPTL 1252.)
Under article 12, New York City real property falls into four classes. Class one covers one-, two- and three-family homes, class two covers all other residential real property which is not designated as class one (e.g., residential apartment buildings), except hotels and motels and other similar commercial property, class three covers utility real property, and class four covers all other real property. (RPTL 1802 [1].) Article 12-A does not have such classifications. (RPTL 1252.) Since the City of New York has historically assessed class one properties at much lower values than class two properties, the article 12 equalization ratio produces a more accurate measure of capital value. However, the article 12-A equalization ratio, which is determined without differentiation of real property classes, has produced a less accurate measurement of value resulting in an “overvaluation.” (City of N.Y. v DHCR at 228.)
Issues
There are two issues for this court to determine as follows:
(1) Was it arbitrary and capricious for the DHCR to adopt a new standard in calculating the equalized assessed value pursuant to RPTL article 12, which is in contravention of its own regulations that had established the standard as article 12-A, because employing article 12-A would indisputably produce an “overvaluation” contrary to the legislative intent?
*486 (2) Was it arbitrary and capricious for the DHCR to adopt the Hertz methodology in determining the owner’s hardship rent increase application?
Analysis
Statutory Construction and Interpretation
Recently, the Court of Appeals reviewed the principles that courts must adhere to when interpreting certain rent laws and regulations that the DHCR has administered. (Roberts v Tishman Speyer Props., L.P, 13 NY3d 270 [2009].) The courts would defer to the DHCR in interpreting the rent laws if it has “specialized knowledge and understanding of underlying operational practices or . . .an evaluation of factual data and inferences to be drawn therefrom” unless its interpretation is “irrational or unreasonable.” (Id. at 285, quoting Matter of KSLM-Columbus Apts., Inc. v New York State Div. of Hous. & Community Renewal, 5 NY3d 303, 312 [2005], quoting Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 459 [1980] [internal quotation marks omitted].) Of course, “if the regulation runs counter to the clear wording of a statutory provision, it should not be accorded any weight.” (Id.)
When construing a statute, the courts must first look to the language of the statute. If the language is clear and unambiguous, the courts must follow the plain meaning of the statute. If, however, the language is ambiguous, the courts would resort to examination of the underlying legislative intent and purpose of the statute. (Id.) Moreover, statutes which relate to the same matter or subject are read in “pari materia” and must be construed together to discern the legislative intent and purpose. (McKinney’s Cons Laws of NY, Book 1, Statutes § 221; Matter of Plato’s Cave Corp. v State Liq. Auth., 68 NY2d 791 [1986].)
Statute v Regulation
As stated above, the rent control statute, Administrative Code § 26-405 (g) (1) (a) (1), does not specify which equalization ratio the DHCR is required to employ when deciding hardship rent increase applications. The DHCR filled in the gap by promulgating a regulation, 9 NYCRR 2202.8 (a) (4), utilizing RPTL article 12-A as the equalization ratio. At that time, the MBR statutory scheme also utilized article 12-A as the equalization ratio. (Matter of Community Hous. Improvement Program v New York State Div. of Hous. & Community Renewal, 230 AD2d 66 [3d Dept 1997] [the MBR capital value was determined to be the equalized assessed valuation pursuant to article 12-A].) In direct re *487 sponse thereto, the City of New York enacted Local Law No. 73 of 1997, which changed the equalized assessed value from RPTL article 12-A to the current article 12 valuation. However, the City of New York never changed the counterpart hardship statutory authority, seemingly because there was no direct reference to any equalization ratio.
It is clear that the plain language of Administrative Code § 26-405 (g) (1) (a) (1) does not provide any guidance as to which equalization ratio to employ in computing hardship rent increase applications. Therefore, this court must look to the legislative intent and purpose.
The stated purpose of rent control (and rent stabilization) laws is to prevent “speculative, unwarranted and abnormal increases in rents; . . . exactions of unjust, unreasonable and oppressive rents” and “to forestall profiteering, speculation and other disruptive practices ... in order to prevent uncertainty, hardship and dislocation” which tend to produce serious threats to the “public health, safety and general welfare.” (McKinney’s Uncons Laws of NY [Emergency Housing Rent Control Law] § 8581 [1], as added by L 1946, ch 274, § 1, as amended.)
In light of the remedial nature of the rent control laws, they must be broadly interpreted to fulfill their avowed purpose. The Tenants Association alleged that the granting of the hardship rent increase application based on article 12-A, which was found by the Court of Appeals to produce an overvaluation, would increase rents on a “massive scale” and would be “catastrophic [so that the tenants] would be forced to move.” (City of N.Y. v DHCR at 228.) Indeed, the Court of Appeals has upheld the DHCR’s denial of a hardship rent increase application where the equalized assessed valuation produced a “false value” because it would not be “carrying out the legislative intent” and “work an injustice and thwart the result sought to be achieved by the statute.” (Matter of Realty & Indus. Corp. v Gaynor, 24 AD2d 201, 204 [1st Dept 1965], affd 17 NY2d 734 [1966] [DHCR utilized a town equalization rate contrary to its normal practice to use the village rate because the town rate was more accurate].)
The rent control laws are a patchwork of legislation enacted at different times, but remain one body of law. The statutory scheme married the general framework of the MBR with the realization that an owner may need a hardship rent increase to financially secure the viability of the rent-controlled building. It is quite clear that the MBR and hardship rent increase *488 components relate to the same subject, are to be read in pari materia, and must be construed together as part of the same statutory scheme. (Statutes § 221; Matter of Plato’s Cave Corp. v State Liq. Auth., supra.)
With this backdrop, it is apparent that computing the equalized assessed value pursuant to RPTL article 12-A for hardship rent increases would run counter to and frustrate the clear legislative intent of the rent control statute and, specifically, Administrative Code § 26-405 (g) (1) (a). This court is mindful that the DHCR promulgated a regulation, 9 NYCRR 2202.8 (a) (4), interpreting the statute differently. This regulation was properly applied until 1997, when the New York City Council evidenced its preference by changing the MBR equalized assessed value from RPTL article 12-A to the current article 12 valuation. As a result, the DHCR has employed two different valuations in determining MBRs (RPTL art 12) and hardship rent increase applications (RPTL art 12-A) even though both Administrative Code § 26-405 (a) (3) and (g) (1) (a) refer to the same definition of capital value. It would be incongruous and violative of statutory construction principles not to read them in pari materia unless the City Council expressly stated its intent to treat them differently.
The DHCR now correctly acknowledges that its regulation 9 NYCRR 2202.8 (a) (4) is contrary to the legislative intent and has properly adopted a new interpretation that harmonizes and fulfills the purpose of the statute. Since 9 NYCRR 2202.8 (a) (4) runs counter to the clear legislative intent and purpose of the statute, it should not be accorded any weight. (See e.g. Roberts v Tishman Speyer Props., L.P) Therefore, the owner’s arguments that the DHCR violated administrative procedural rules as set forth in Matter of Charles A. Field Delivery Serv. (Roberts) (66 NY2d 516 [1985] [Field Delivery doctrine]) and section 102 (2) (a) (i) of the State Administrative Procedure Act are inapplicable as the regulation runs counter to the statute. Thus, the first issue is answered in the negative.
Hertz Methodology
The DHCR properly considered as income maintenance payments that shareholders paid to the cooperative corporation instead of the actual rent paid by the individual rent-controlled tenants. (Hertz.) This court rejects the owner’s argument that this methodology, first introduced in 2002, should not be applied because it made its application earlier in 1995, since the owner also contributed to the delay. (See n 1.) (Matter of Schutt *489 v New York State Div. of Hous. & Community Renewal, 278 AD2d 58 [1st Dept 2000].) Thus, the second issue is also answered in the negative.
Discovery
The owner also seeks an order pursuant to CPLR 408, granting it leave to obtain certain discovery from DHCR representatives and nonparties New York City Council Speaker Christine C. Quinn and New York State Assemblyman Richard N. Gottfried because the owner alleges that these and other elected officials “influenced” the DHCR’s decision in denying its hardship rent increase application and sent an ex parte letter dated December 21, 2010 to the DHCR after the agency “considered the record closed.” However, the elected officials’ actions are, in fact, legitimate advocacy to promote housing policies that they believed were beneficial to safeguard the shrinking affordable housing stock in the City of New York, so long as the owner was notified of the communication. Inasmuch as the DHCR’s determination was rational, based on the above record, the owner’s request for discovery is denied as moot. (Matter of Alcoma Corp. v New York State Div. of Hous. & Community Renewal, 170 AD2d 324 [1st Dept 1991], affd 79 NY2d 834 [1992].)
Conclusion
Accordingly, it is ordered and adjudged, that the petitioner’s motion for discovery is denied as moot; and it is further ordered and adjudged, that the petition is denied and the proceeding is dismissed with prejudice.

. The owner attributes the delay to the DHCR, and the DHCR responds that the owner caused much of the delay, amounting to more than nine years, by seeking many long extensions and failing to timely produce requested documents to support its hardship application. (See DHCR’s mem of law dated May 5, 2011, in opposition to amended verified petition, point II, at 16.) Therefore, it cannot be said that the owner made a requisite showing that DHCR alone intentionally, wilfully, or negligently delayed the application process.

. In 1970, the City of New York passed Local Law No. 30, enacting a new maximum rent formula which took into account the equalized assessed value of the property pursuant to RPTL article 12-A. Thereafter, in 1997, the City of New York enacted Local Law No. 73, which changed the equalized assessed value from RPTL article 12-A to the current article 12 valuation. (Administrative Code § 26-405 [a] [3].)