Alston v Starrett City, Inc. (2018 NY Slip Op 02420)





Alston v Starrett City, Inc.


2018 NY Slip Op 02420


Decided on April 5, 2018


Appellate Division, First Department


Sweeny, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on April 5, 2018
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

John W. Sweeny, Jr.J.P.
Sallie Manzanet-Daniels
Troy K. Webber
Marcy L. Kahn
Peter H. Moulton,JJ.


452674/15 

[*1]Regina Alston, et al., Plaintiffs-Respondents,
v
Starrett City, Inc., et al., Defendants-Appellants. 
The City of New York, Amicus Curiae.



Defendants appeal from the order of the Supreme Court,
New York County (Shlomo Hagler, J.), entered July 7, 2016, which granted plaintiffs' motion for a preliminary injunction to the extent of directing defendants to process and respond to plaintiff Sandra Vaughn-Cooke's application for an apartment in defendants' housing complex, and denied defendants' CPLR 3211 motion to dismiss the complaint for failure to state a claim.




Horing Welikson & Rosen, P.C., Williston Park (Niles C. Welikson of counsel), for appellants.
The Legal Aid Society, New York (Robert Desir, Judith Goldiner, Joshua Goldstein and Beth Hofmeister of counsel), and Mayer Brown LLP, New York (Jason I. Kirschner, Joaquin M. C de Baca, Mark G. Hanchet, Michael E. Rayfield, Noah Liben and Kevin C. Kelly of counsel), for respondents.
Zachary W. Carter, Corporation Counsel, New York (Barbara Graves-Poller, Aaron Bloom and Doris Bernhardt of counsel), for amicus curiae.



SWEENY, J.


This case involves the interplay of several statutes that constitute "[t]he patchwork of rent control legislation" at the federal, state and city levels (Matter of 89 Christopher v Joy, 35 NY2d 213, 220 [1974]). The issue before us is whether certain provisions of the City of New York's Living in Communities (LINC) Program violates New York State's Urstadt Law. For the reasons that follow, we hold that defendants correctly contend that the rider provisions contained in the LINC leases do violate the Urstadt Law.
We begin our analysis by reviewing the relevant portions of the statutes and regulations applicable to this case.
In 1971, the State Legislature enacted what is commonly referred to as the Urstadt Law (L 1971, ch 372, as amended by L 1971, ch 1012 [Unconsolidated Laws § 8605]). This statute amended the Local Emergency Housing Rent Control Act (LEHRCA) and provides, in relevant part:
"[N]o local law or ordinance shall hereafter
provide for the regulation and control of
residential rents and eviction in respect of
any housing accommodations which are (1)
presently exempt from such regulation and
control or (2) hereafter decontrolled either
by operation of law or by a city housing rent
agency, by order or otherwise. No housing accommodations presently subject to regulation
and control pursuant to local laws or ordinances adopted or amended under authority of this
subdivision shall hereafter be by local law or ordinance or by rule or regulation which has not
been theretofore approved by the state
commissioner of housing and community renewal
subjected to more stringent or restrictive provisions of regulation and control than those presently in effect.
"Notwithstanding any other provision of law, . . .
a city having a population of one million or
more shall not, either through its local
legislative body or otherwise, adopt or amend
local laws or ordinances with respect to the
regulation and control of residential rents and eviction, including but not limited to provision
for the establishment and adjustment of rents
[or] the regulation of evictions . . . ."
The "Urstadt Law was intended to check City attempts, whether by local law or regulation, to expand the set of buildings subject to rent control or stabilization, and particularly to do so in the teeth of State enactments aimed at achieving the opposite effect" (City of New York v New York State Div. of Hous. & Community Renewal, 97 NY2d 216, 227 [2001]).
On March 26, 2008, the New York City Human Rights Law (§ 8-101 of the Administrative Code of the City of New York) was amended by Local Law 10 to ban discrimination by landlords against tenants based on their lawful source of income, including Section 8 federal housing vouchers. "Lawful source of income" is defined to "include income derived from social security, or any form of federal, state or local public assistance or housing assistance including section 8 vouchers" (Administrative Code § 8-102[25]).
Administrative Code § 8-107(5)(a)(1)(a) makes it unlawful "[t]o refuse to . . . rent, lease, approve the . . . or otherwise deny to or withhold from any persons or group of persons such a housing accommodation or any interest therein . . . because of any lawful source of income of such person or persons." Furthermore, § 8-107(5)(a)(1)(b) makes it unlawful "[t]o discriminate against "[any person] . . . because of any lawful source of income of such person . . . in the terms, conditions, or privileges of the . . . rental or lease of any such housing accommodation or an interest therein or in the furnishing of facilities or services in connection therewith."
In 2014 and 2015, in an effort to move persons living in homeless and domestic violence shelters into more stable housing, the City, via its Human Resources Administration (HRA) and Department of Homeless Services, promulgated the LINC program. For those who qualify, LINC provides rental supplements or vouchers, usually paid by HRA directly to the landlord. The program also pays other costs such as moving expenses, security deposits and broker commissions.
Most LINC programs, including the one at issue herein, require the landlord to enter into a lease rider. This rider requires the landlord to agree that the LINC tenant's lease shall automatically renew for a second year at the same rent as the first year, and limits rent increases for the following three years to amounts approved by the Rent Guidelines Board for rent-stabilized apartments throughout the city. These terms are apparently non-negotiable.
Defendant Starrett City, Inc. was formed as a limited profit housing company pursuant to the Private Housing Finance Law, Article II, commonly known as the Mitchell-Lama Law. It is the owner of a 46-building housing complex in Brooklyn known as Spring Creek Towers. Pursuant to the Mitchell-Lama Law, New York State Division of Housing and Community Renewal sets rents at the complex under a Budget Rent Determination (BRD) process. Thus, rents at the complex are not governed by the Rent Control or Rent Stabilization Laws.
Of the complex's 5,881 units, 3,569 are subject to a project-based Section 8 contract with the U.S. Department of Housing and Urban Development. Another 470 tenants hold Section 8 vouchers. Rents for these units are set pursuant to the BRD process.
In 2015, both individual plaintiffs Regina Alston and Sandra Vaughn-Cooke were living in homeless shelters. Both were employed full time but were unable to afford market-rate residences. While in the shelter, each obtained a LINC rent voucher.
Each individual plaintiff called Starrett at a separate time inquiring about an apartment advertised on its website for the Spring Creek Towers complex. When each advised Starrett's agent she would be using a LINC voucher, both were advised that Starrett did not accept LINC vouchers.
The individual plaintiffs along with plaintiff Fair Housing Justice Center, a housing advocacy group, thereafter commenced this action asserting causes of action against defendants for source of income discrimination under the New York City Human Rights Law. It was alleged, inter alia, that defendants, by refusing to accept LINC vouchers, were engaging in source of income discrimination in violation of Local Law 10. In lieu of an answer, defendants moved to dismiss the complaint for failure to state a cause of action. Defendants contended, among other things, that, because the LINC Program compels landlords to offer covered tenants multiple lease renewals at percentages no greater than prevailing rent stabilized rates, the LINC Program constitutes a de facto expansion of buildings subject to City regulatory control, and, therefore, is [*2]violative of the Urstadt Law.
The motion court determined that the initial rent negotiated by the landlord and a potential LINC recipient does not appear to be governed by rent control and rent stabilization programs and that requiring future rent increases to be governed by the guidelines established for those programs does not convert the apartment into a rent-controlled or rent-stabilized apartment, subject to all the requirements of those programs. The court denied defendants' motion to dismiss and this appeal followed.[FN1]
The motion court erred in two respects. Although it found that the initial rent need not be determined pursuant to rent control/stabilization restrictions, it discounted the fact that the LINC program mandates renewals that are subject to rent stabilization increases. As discussed herein, it is the effect of the local law, not its wording, that determines whether such law expands control over housing units not presently subject to these controls.
More importantly, although the LINC program focuses on rent control/stabilization, that is not the only type of expanded control which the Urstadt Law prohibits. The statute, while of course addressing rent and evictions, also speaks of "more stringent or restrictive provisions of regulation and control than those presently in effect." The Urstadt prohibitions on expanding control thus go beyond the issue of rent regulation, and encompass attempts by the local municipality to expand its control over housing units unless approved by the state DCHR. Although the motion court found that, by accepting a LINC applicant, the housing unit did not become a rent-controlled unit, this did not take that unit out of the Urstadt prohibitions. The simple fact is that the unit now became subject to additional controls to which it had not been subject to prior to signing the LINC lease, thereby extending the City's control over that unit, in violation of the Urstadt Law.
Standing alone, neither Local Law 10 nor the LINC Program's use of rent vouchers violates the Urstadt Law. The defendants herein concede as much. In fact, we have previously held that, to the extent it compels landlords to accept governmental rent vouchers for payment of rent, Local Law 10's "source of income" discrimination provisions do not violate the Urstadt Law (see Tapia v Successful Mgt. Corp., 79 AD3d 422, 425 [1st Dept 2010]). Where the LINC Program runs afoul of the Urstadt Law, however, is in its use of mandatory riders that compel a landlord to renew a lease for up to five years at a minimum increase specifically tied to other City rent regulatory programs to which the housing unit is not presently subject. The application of Local Law 10 to compel acceptance of LINC Program rent vouchers as presently structured effectively expands the number of buildings subject to City control by imposing on those housing units a more stringent control than presently exists. This creates exactly the situation which the Urstadt Law forbids (see City of New York, 97 NY2d at 227; Real Estate Bd. of N.Y., Inc. v City Council of City of N.Y., 16 Misc 3d 530, 532, 538 [Sup Ct, NY County 2007]). In determining whether a local law imposes more stringent or restrictive control over a housing unit than presently existed, the "substance rather than the form of the local law is determinative" (Mayer v City Rent Agency, 46 NY2d 139, 149 [1978]). "The key [is] the effect of the legislation on City regulatory control" (City of New York v New York State Div. of Hous. & Community Renewal, 97 NY2d at 227). Here, the effect of the LINC lease riders clearly and improperly expands City regulatory control to housing units not presently subject to that control.
Our decision in Tapia, supra, relied on by plaintiffs and the amicus, does not require a different result. There we held that, to the extent Local Law 10 required landlords to accept tenants with Section 8 vouchers, it did not violate the Urstadt Law. We explained that [*3]"acceptance of plaintiffs' Section 8 vouchers will have no impact in expanding the buildings subject to the rent stabilization law or expanding regulation under the rent laws, and thus does not offend the objective of the Urstadt Law" (79 AD3d 425). Significantly, the defendants in Tapia submitted no evidence that acceptance of Section 8 vouchers would "limit the rent increases that they could [otherwise] obtain" (Tapia v Successful Mgt. Corp., 24 Misc 3d 1222(A), 2009 NY Slip Op 51552[U], at **** 6 [Sup Ct, NY County 2009], affd 79 AD3d 422 [1st Dept 2010]). Here, by contrast, it is undisputed - indeed it is specifically stated in the LINC program under consideration - that defendants' acceptance of LINC vouchers would limit the amount of rent increases for up to five years, far in excess of the roughly six months of rent restriction held in Real Estate Board to be violative of the Urstadt Law.
Based upon the foregoing, it is clear that compelling defendants to accept tenants with LINC Program rent vouchers as structured herein violates the Urstadt Law's proscription against expanding the number of housing units subject to "more stringent or restrictive provisions of regulation and control than those presently in effect."
In view of the foregoing, we need not reach the remaining contentions of the parties.
Accordingly, the order of the Supreme Court, New York County (Shlomo Hagler, J.), entered July 7, 2016, which granted plaintiffs' motion for a preliminary injunction to the extent of directing defendants to process and respond to plaintiff Sandra Vaughn-Cooke's application for an apartment in defendants' housing complex, and denied defendants' CPLR 3211 motion to dismiss the complaint for failure to state a claim, should be reversed, on the law, without costs, the preliminary injunction vacated, and defendants' motion to dismiss the complaint granted. The Clerk is directed to enter judgment for defendants.
All concur.
Order, Supreme Court, New York County (Shlomo Hagler, J.), entered July 7, 2016, reversed, on the law, without costs, the preliminary injunction vacated and defendants' motion to dismiss the complaint granted. The Clerk is directed to enter judgment for defendants.
Opinion by Sweeny, J. All concur.
Sweeny, J.P., Manzanet-Daniels, Webber, Kahn, Moulton, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: APRIL 5, 2018
CLERK



Footnotes

Footnote 1:The City of New York has filed an amicus curiae brief on behalf of plaintiffs.